**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

GEORGIA STATE CONFERENCE
OF THE NAACP, *et al.,*

       *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State for the State of Georgia, *et al.,*

       *Defendants.*

CIVIL ACTION

FILE NO. 1:21-CV-01259-JPB

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

Plaintiffs' attacks on SB 202 are all smoke and no fire. For example, Plaintiffs allege that the "omnibus voter suppression bill," as they label SB 202, "threaten[s] the fundamental right to vote of all Georgians." [Doc. 1, ¶ 6]. They further claim that SB 202 is "using racial discrimination as a means of achieving a partisan end" and that its changes are "aimed at suppressing the vote of Black voters and other voters of color." *Id*. at ¶¶ 2-3.

But despite these superheated accusations, Plaintiffs identify only three areas where they claim there is *any* racial impact from Georgia's voting processes as modified by SB 202: Sunday voting, *id*. at ¶¶ 64-66, 132; line length, *id*. at ¶¶ 70-71, 133; and the relative utilization of early voting, *id*. at ¶ 83. And even with these three practices, Plaintiffs misunderstand the provisions of SB 202. On Sunday and early voting, far from giving registrars the ability "to entirely eliminate Sunday early voting," *id*. at ¶¶ 116(4), 132, 149, SB 202 created a higher minimum for early-voting days than what is proposed in pending federal legislation like S.1, added a required Saturday, and for the first time specifically authorized early voting on Sundays. Ex. A[1] at 4:84-90. On lines at precincts, SB 202 now requires counties to take specific

---

[1] A copy of SB 202 is attached as Exhibit A, with references to page and line numbers.

steps to eliminate long voting lines. Ex. A at 29:721-734.

The remaining provisions challenged by Plaintiffs are already the law in a number of other states and a fair reading of the legislation demonstrates that it is easy to vote in the state of Georgia. While Plaintiffs have policy disagreements about election administration, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). And "States—not federal courts—are in charge of setting those rules." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

As a threshold matter, moreover, Plaintiffs do not have standing to invoke this Court's jurisdiction over state election laws. That is because they have not alleged a sufficient injury—as with the litany of post-2020 cases that were properly dismissed for lack of standing.

But even if this Court reaches the merits, Plaintiffs have not stated a claim. SB 202 updates Georgia's reasonable, nondiscriminatory election rules in response to lessons learned in 2020. This Court should "follow the law as written and leave the policy decisions for others." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Reg. & Elections*, No. 1:20-CV-01587-WMR, 2020 U.S. Dist. LEXIS 211736, at *4 (N.D. Ga. Oct. 5, 2020) ("*GALEO*").

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs ask this Court to enjoin seven components of SB 202 because they claim those changes are (1) intentionally discriminatory, (2) violate Section 2 of the Voting Rights Act, (3) place an undue burden on the right to vote, and (4) violate the First Amendment. *See generally* [Doc. 1].

The pertinent legal standards are clear: Where a motion to dismiss is brought pursuant to FRCP 12(b)(1), the Court is not limited to the four corners of the Complaint to adequately satisfy itself of jurisdiction over the matter. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982). In evaluating a 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations." *Id*. And, to survive a motion to dismiss under FRCP 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions "couched as [] factual allegation[s]." *Id*. at 678-79. This Court may also consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Application of these settled standards requires dismissal.

3

## I.    Plaintiffs do not have standing.

One ground for dismissal is lack of standing. As the Eleventh Circuit explained recently, "Federal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006)). Instead, Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. Art. III § 2. And "[t]o have a case or controversy, a litigant must establish that he has standing." *Jacobson v. Fla. Sec. of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

To demonstrate standing at the pleading stage, Plaintiffs must allege "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id*. The party invoking federal jurisdiction bears the burden of establishing standing at the start of the lawsuit and at each phase of the litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992); *see also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001). Plaintiffs must also show a concrete and particularized injury. *Wood*, 981 F.3d at 1314 (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020)). And there must be a substantial risk of injury or it must be "certainly impending."

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Organizations can establish an injury either by (1) showing they diverted resources in response to the purportedly illegal acts of Defendants, or (2) "stepping in the shoes" of their members. Utilizing either of these paths requires Plaintiffs to otherwise satisfy the remaining elements of standing—and those elements are not satisfied here.

### A.    Plaintiffs do not adequately allege an injury.

#### 1.    *Organizational standing.*

A plaintiff claiming diversion of resources as an injury must demonstrate that "a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014). This requires the plaintiff to show not only what the organization is diverting resources *to*, but also "what activities [the organization] would divert resources away *from* in order to spend additional resources on combatting" the impact of the law. *Jacobson*, 974 F.3d at 1250. As another judge on this court held, this requires more than evidence of an accounting transfer: there must be an "indication" that the organization "would in fact be diverting . . . resources *away from their core activities*." *GALEO*, 2020 U.S. Dist. LEXIS 211736, at *17 (emphasis

added).[2] Or, as the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are already doing." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019). Further, organizations "cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Id.* (cleaned up). Organizations must demonstrate that the challenged law's effect "goes far beyond 'business as usual'" through evidence of a disruption in their operations or the likelihood of significant changes to their activities. *Id.*

In *GALEO*, for example, the plaintiff alleged it had standing because it was forced to divert resources "from getting out the vote and voter education to 'reach out to and educate [limited English proficiency voters] about how to navigate the mail voting process… as well as other aspects of the electoral process." *GALEO*, 2020 U.S. Dist. LEXIS 211736 at *17. But GALEO's mission included "organizing voter education, civic engagement, [and] voter empowerment." *Id.* The district court dismissed the case and found "there is no indication that GALEO would in fact be diverting any resources away from the

---

[2] Plaintiffs appealed this dismissal and it is pending at the Eleventh Circuit.

core activities it already engages in by continuing to educate and inform Latino voters." *Id*. And allegations of new or additional efforts were "precisely of the same nature as those that GALEO engaged in before…" *Id*.

The same is true here. Taking the allegations in the Complaint as true, there is no "indication" that the alleged actions thus far undertaken—or those they claim will be taken later—are different in nature from what Plaintiffs already engaged in before SB 202. The Georgia NAACP, for example, will simply continue to offer messaging to voters of color, as well as dedicate resources "to educate and assist eligible voters." [Doc. 1, ¶ 21]. The Georgia NAACP frames this as a change from their normal mission, but it is directly in line with how they describe their current activities: "The Georgia NAACP works to protect voting rights through litigation…. voter registration, voter education, GOTV efforts…" *Id*. at ¶ 12.

Similarly, Georgia Coalition for the People's Agenda ("GCPA") states that it "provide[s] outreach and support to voters and prospective voters of color and underserved communities…" *Id*. at ¶ 26. GCPA claims it will "divert a portion of its financial and other organizational resources to educating voters about [changes brought on by SB 202]." *Id*. at ¶ 35. But this is exactly in line with their mission of providing "outreach and support to voters."

The League of Women Voters of Georgia ("League") faces the same

hurdle. They broadly state their mission as "empowering voters and defending democracy." *Id.* at ¶ 37. And the League claims to be diverting resources sufficient for Article III standing because they will need to "update standard training materials and informational booklets" to reflect changes brought on by SB 202. *Id.* at ¶ 40. But updating existing program materials does not constitute a diversion of resources sufficient to afford standing.

GALEO Latino Community Development Fund, Inc. ("GALEO LCDF") describes itself has "one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community." *Id.* at ¶ 42. It alleges its work includes "organizing voter education, civic engagement, voter empowerment and get out the vote events…" *Id. at* ¶ 43. But its alleged diversion is simply "assist[ing] voters . . . in being able to navigate the many changes and challenges of SB 202 . . ." *Id.* at ¶ 47. This in no way deviates from the stated mission of GALEO LCDF. *Id.*

Common Cause only claims to have "increased its efforts in the areas of election protection, voter education, and grassroots mobilization around voting rights," as a result of SB 202. *Id.* at ¶ 49. But a mere increase in efforts does not create standing. *See, e.g.*, *Common Cause,* 937 F.3d at 955.

    2.    *Associational standing.*

Lower Muskogee Creek Tribe only alleges standing on behalf of its

members, but its associational-standing allegation fails. [Doc. 1, ¶¶ 53-54]. To establish associational standing, the Supreme Court has held that—at a minimum—"plaintiff-organizations [must] make specific allegations establishing that at least one *identified* member [has] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added)*; Republican Party v. SEC*, 888 F.3d 1198, 1203-05 (11th Cir. 2018).

Further, any potential injury faced by its members is too speculative to support standing here because any injury is not concrete and particularized. *See Tsao v. Captiva MVP Rest. Partners, LLC.*, 986 F.3d 1332, 1339 (11th Cir. 2021); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc). Any injury to a member is based solely on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, and cannot establish standing on an associational basis because the members do not have standing to sue in their own right. *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996); *Wood*, 981 F.3d at 1314 (no concrete injury to individual voter); *Bognet v. Sec'y Pa.*, 980 F.3d 336, 356 (3d Cir. 2020) (same).

## B.    Plaintiffs have not alleged harms traceable to Defendants.

Even if this Court finds Plaintiffs have diverted resources sufficient to establish an injury, many of the Plaintiffs' claims should be dismissed because they cannot establish that the alleged injuries are traceable to Defendants. To

satisfy the causation requirement, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560, and here several challenged practices have nothing to do with Defendants.

For example, Plaintiffs challenge language in SB 202 that "[e]ncourag[es] the submission of large numbers of voter challenges" to voters' registration status. [Doc. 1, ¶ 116]. But those challenges are brought and heard at the county level. *See, e.g.* O.C.G.A. § 21-2-229, *et seq.* A ruling from this Court that alters the processes counties use in determining challenges would be ineffectual because "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury." *Lewis v. Governor of Ala.,* 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up and emphasis in original). For the same reason, Plaintiffs' claims relating to "[r]emoving the voting power of the Secretary of State," challenges to "long lines" at polling places (even though the law includes provisions to shorten lines), and "[g]iving county registrars unfettered discretion to limit early voting" (which is simply wrong) are not traceable to Defendants and, thus, are beyond this Court's capacity to redress. *Anderson v. Raffensperger*, No. 1:20-cv-03263, 2020 U.S. Dist. LEXIS 188677, at *61 (N.D. Ga. Oct. 13, 2020); *see also Ga. Repub. Party, Inc. v. Ga. Sec'y of State*, No. 20-

14741-RR, 2020 U.S. App. LEXIS 39969, at *6 (11th Cir. Dec. 20, 2020).

## II.   Plaintiffs fail to state a claim on which relief can be granted.

### A.   Relevant legal standards.

#### 1.   *Intentional racial discrimination (Count I).*

Plaintiffs bring a single count of intentional racial discrimination under the Constitution (the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment) and Section 2 of the Voting Rights Act. [Doc. 1, ¶¶ 108-128]. To prevail, Plaintiffs must allege first that "the State's decision or act had a discriminatory purpose and effect. . . . If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Greater Birmingham Min. v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (cleaned up and emphasis in original). Only if Plaintiffs establish that the State's act had a discriminatory intent or effect does "the burden shift[] to the law's defenders to demonstrate that the law would have been enacted without this [racial-discrimination] factor." *Id.* quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005). Courts use the multi-factor approach of *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), to assess intent and effect. [3]

---

[3] The Eleventh Circuit summarized these factors in *Greater Birmingham Min.*, 992 F.3d at 1322.

2.     *Section 2 of the Voting Rights Act (Count II).*

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "standard, practice or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). "This analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." *Greater Birmingham Min.*, 992 F.3d at 1329 (emphasis in original). To make out a valid vote-denial[4] claim, the Eleventh Circuit requires proof (1) of disparate impact (a law results in a denial or abridgement) and (2) that the disparate impact is *caused* by racial bias. *Id.*; *see also Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 626-27 (6th Cir. 2016); *Dem. Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020); *Veasey*, 830 F.3d at 243-245; *League of Women Voters*, 769 F.3d at 240.

3.     *Fundamental right to vote (Count III).*

Plaintiffs challenge seven practices as facially unconstitutional. But

---

[4] Vote-denial claims challenge specific election practices. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

facial challenges to election practices are disfavored because "the proper [judicial] remedy—even assuming [the law imposes] an unjustified burden on some voters—[is not] to invalidate the entire statute." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008) (controlling opinion) (cleaned up). Such challenges "must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican* Party, 552 U.S. 442, 449 (2008). As the Supreme Court elsewhere held, "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Courts distinguish severe burdens from non-severe ones and incidental burdens (such as photo ID laws) "aris[e] from life's vagaries" and thus fall into the latter category. *Crawford*, 553 U.S. at 191, 197-98. Significantly, lesser burdens impose no burden of proof or evidentiary showing on states. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *see also Munro*, 479 U.S. at 195.

    4.    *Freedom of speech/association (Count IV).*

Plaintiffs challenge the provisions limiting the distribution of absentee

ballots as potential violations of the First Amendment's protections for "core political speech." [Doc. 1, ¶ 161]. But the Supreme Court has "extended First Amendment protection *only* to conduct that is *inherently expressive*." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) (emphasis added); *see also U.S. v. O'Brien*, 391 U.S. 367, 376 (1968); *Texas v. Johnson*, 491 U.S. 397, 406 (1989). If the conduct prohibited by SB 202 related to elections is not expressive, then either the First Amendment does not apply or the appropriate analysis is *Anderson/Burdick*—the same as for the fundamental-right-to-vote count. *See Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 773 (M.D. Tenn. 2020); *see also Jacobson*, 974 F.3d at 1261.

## B.    Application to particular challenged practices.[5]

Georgia's compelling interests in enacting SB 202 include: (1) "deterring and detecting voter fraud;" (2) "participating in a nationwide effort to improve . . . election procedures;"  (3) "safeguarding voter confidence;" (4) "conducting an efficient election;" and (5) "maintaining order." *New Ga. Project*, 976 F.3d at 1282; *Greater Birmingham Min.*, 992 F.3d at 1319. In light of those

---

[5] Plaintiffs mention SB 202's minor changes to existing voter-challenge laws in their intentional-discrimination count [Doc. 1, ¶116(9)], but do not list this in their "challenged provisions" section and do not otherwise discuss it in their Complaint. They do not allege any burden on the right to vote or racially disparate treatment of voters based on these provisions.

interests, each of Plaintiffs' challenges fails as a matter of law.

### 1.   *Absentee ID requirements (Counts I and III).*

Plaintiffs first take issue with the use of an identification number for absentee-ballot applications.[6] [Doc. 1, ¶¶ 58-59, 116(1), 147]. The prior method for verifying ballots by using signature-matching was subjective and challenged by both Democratic and Republican groups. Ex. A at 4:73-75. The SB 202 process is objective and includes safeguards for voters who lack identification. Ex. A at 38:949-39:956; 51:1297-52:1305. Plaintiffs allege a possible disproportionate impact on minority voters who do not have a photo ID. [Doc. 1, ¶ 84]. But the Eleventh Circuit and Supreme Court have already determined there is no unconstitutional burden on the right to vote by requiring photo identification. *Crawford*, 553 U.S. at 181; *Greater Birmingham Min.*, 992 F.3d at 1320. Thus, even if there is a slight burden, it is more than justified by the state's regulatory interests. SB 202's verification requirement also closely matches the requirements of federal law for voters registering to vote by mail, a law that Plaintiffs do not challenge. *See* 52 U.S.C. § 21083(b)(2).

Plaintiffs' mere allegation that minorities are less likely to possess

---

[6] Also, at least six other states utilize identification with absentee-ballot applications or ballots. *See* Code of Ala. § 17-9-30(b); A.C.A. § 7-5-412(a)(2)(B) (Arkansas); K.S.A. § 25-1122(c) (Kansas); Minn. Stat. Ann. § 203B.07(3); Ohio Rev. Code Ann. § 3509.03(B), .04(B); Wis. Stat. § 6.87(1).

identification is not a sufficient allegation of a discriminatory effect for their intentional-discrimination claim. *Compare* [Doc. 1, ¶ 84] *with Greater Birmingham Min.*, 992 F.3d at 1320. But even if it were, Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. The alleged impact is minimal at best, the history relied on is far distant, the legislation went through normal channels, and the legislature explained exactly what it was doing in the first pages of the bill—and none of the statements by the legislature were racially discriminatory. *Compare* [Doc. 1] and Ex. A, 4:69-7:148 *with Greater Birmingham Min.*, 992 F.3d at 1321-1328.

> 2. *Prohibition on public officials mailing applications and limitations on private groups (Counts I, III, and IV).*

SB 202 places several minor limits on the distribution of absentee-ballot applications after the legislature determined that "enthusiasm of some outside groups in sending multiple absentee ballot applications in 2020, often with incorrectly filled-in voter information, led to significant confusion by electors." Ex. A at 5:103-105. Plaintiffs can send[7] as many absentee-ballot applications to as many voters as they like, up until the time that the voter returns a completed application—at that point, the voter cannot continue receiving

---

[7] Plaintiffs' challenges to the limitations on government officials sending absentee-ballot applications are not a concrete injury for purposes of this Court's jurisdiction.

additional applications. Ex. A at 41:1025-42:1036. SB 202 includes a safe harbor if the sending entity has checked the publicly available list within five business days of mailing applications. *Id*.

These provisions do not implicate speech at all because they prohibit no spoken or written expression and only prohibit a very limited category of activity related to absentee-ballot applications. [Doc. 1, ¶ 116(2) and (3)]; *Lichtenstein*, 489 F. Supp. 3d at 765. The restrictions do not prevent Plaintiffs from "campaign[ing] for, endors[ing], and vot[ing] for their preferred candidate." *Timmons*, 520 U.S. at 363. Thus, as a matter of law, distributing absentee-ballot applications to voters who already requested them is not expressive conduct that implicates speech.

That leaves the constitutional claim under *Anderson/Burdick*, where any burden is non-existent. [Doc. 1, ¶ 148]. Georgia has numerous options for voters to cast their ballots and request absentee ballots. *New Ga. Project*, 976 F.3d at 1281. The State's regulatory interest in avoiding voter confusion by voters receiving unsolicited absentee-ballot applications after requesting a ballot, or after they have already voted, more than outweighs any burden. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020).

Finally, Plaintiffs have not even alleged there is any disparate impact as

a result of limitations on absentee-ballot applications. [Doc. 1, ¶¶ 60, 116(2) and (3)]. Without this allegation, their intentional-discrimination claim also fails. *Greater Birmingham Min.*, 992 F.3d at 1321.

### 3.    Drop boxes (Counts I and III).

Plaintiffs next challenge "restrictions" on outdoor drop boxes, [Doc. 1, ¶¶ 116(5), 150]—a voting method that did not exist in Georgia law prior to SB 202 and was only ever an *optional* mechanism in 2020 under an emergency rule designed as a temporary public-health measure due to COVID-19. Ex. A at 5:113-118; Ga. Comp. R. & Regs. r. 183-1-14-0.8-.14; 183-1-14-0.10-.16; 183-1-14-.08-.14; *see also* O.C.G.A. § 50-13-4(b). SB 202 builds on that emergency rule and *requires*[8] every county to have at least one drop box, and it allows them to be moved outside during emergencies. Ex. A at 47:1172-1174, 1188-1191. The sole race-related claim is that Black voters are more likely to hold jobs that lack flexibility to take time off work. [Doc. 1, ¶ 89]. But there is no right to vote in any particular manner, *Burdick*, 504 U.S. at 433, and changes to some parts of voting access,[9] while retaining others, is a minimal burden at best, *Ohio*

---

[8] The emergency rules adopted by the State Election Board merely *permitted* a county to establish drop boxes but did not *require* that they have one.

[9] Given the large number of locations to drop off mail, which is the primary option for returning absentee ballots, O.C.G.A. § 21-2-385(a) ("personally mail or personally deliver"), there is no elimination of any access in SB 202.

*Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016). Where there are multiple options a voter can use to vote—as there are in Georgia, which remains in the top tier of early and absentee voting nationwide[10]—the right to vote may not be implicated at all. *See, e.g., New Ga. Project*, 976 F.3d at 1281. Plaintiffs fail to show that the State's first-ever statutory authorization of drop boxes places any burden whatsoever on the right to vote. Even if SB 202 is not be as expansive as a temporary emergency rule (which has expired), it is more than justified by the state's regulatory interests. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

Plaintiffs' only allegation of a disparate impact for purposes of their intentional-discrimination claim is that minority voters hold jobs that lack flexibility to utilize early-voting or drop boxes. [Doc. 1, ¶ 89]. But Georgia also *expanded* early-voting hours in SB 202. Ex. A at 59:1499-1500. Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. *See* Section II, B. 1.

> 4.   *Discretion to county officials about setting early voting times (Counts I, II, and III).*

Plaintiffs' challenge to county officials' discretion in setting voting times

---

[10] *See* Center for Election Innovation and Research, *How Easy Is It to Vote Early in Your State?*, https://electioninnovation.org/research/early-voting-availability-2022/ (April 12, 2021).

is equally misguided. [Doc. 1, ¶¶ 63-64, 116(4), 132, 149]. Prior to SB 202, early voting was "conducted during normal business hours on weekdays during [the early voting] period" and on one "Saturday . . . during the hours of 9:00 A.M. through 4:00 P.M." O.C.G.A. § 21-2-385(d)(1) (2020). Counties had general power to "extend the hours for voting beyond regular business hours," *id.*, which some counties used to implement Sunday voting. In contrast, SB 202 set a minimum number of voting hours (at least 9:00AM to 5:00PM but up to 7:00AM to 7:00PM), added a mandatory Saturday, and specifically authorized voting on Sundays.[11] Ex. A at 59:1497-1503.

Plaintiffs' only allegations of a disparate impact for purposes of their intentional-discrimination claim is (1) that minority voters have jobs that will make it difficult to take time off to vote and (2) that minority voters use Sunday voting more frequently. [Doc. 1, ¶¶ 64-66, 83]. But SB 202 *expanded* early-voting hours, adding a required Saturday and specifically authorized Sunday voting for the first time. Ex. A at 59:1499-1500. Again, Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. *See* Section II, B. 1.

---

[11] Before SB 202, if "normal business hours" for a county during a weekday was 9:00AM to 2:00PM, early voting only had to be available at those times. The General Assembly also noted that more than 100 Georgia counties have never offered Sunday voting. Ex. A at 4:86-87.

Plaintiffs' Section 2 claim is based on the same factual error of regarding limiting early voting on Sundays. [Doc. 1, ¶ 132]. But SB 202 does not impose any limitations or authorize Defendants to impose them; rather, it does the opposite, expressly allowing county registrars to hold early voting on Sundays. Ex. A at 59:1497-1503. Even if the alleged harm was an accurate interpretation of the law—which is it not—it is not traceable to any decision by Defendants and hence there is no causal connection as required by Section 2. *Greater Birmingham Min.*, 992 F.3d at 1329.

Finally, Georgia has numerous options for voters to cast their ballots early, in person, and through absentee ballots. *New Ga. Project*, 976 F.3d at 1281. SB 202 expanded those options and thus imposes no burden on the right to vote. Even if it did, the State's interests in providing "multiple opportunities to vote in person on the weekend for the first time," Ex. A at 4:89-90, clearly outweigh any burden. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

### 5.   *Out-of-precinct provisional ballots (Count I and III).*

Plaintiffs challenge the limitations placed on out-of-precinct provisional ballots [Doc. 1, ¶¶ 116(6), 151] even though half the states do not count a

provisional ballot cast out of precinct at all.[12] Georgia legislators also explained that voters who vote out of precinct create "lines for other electors" and "add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct." Ex. A at 6:135-138. Still, the statutory provision explicitly *permits* the counting of out-of-precinct ballots for voters who show up at the wrong precinct after 5:00 P.M. and cannot get to their home precinct before 7:00 P.M. *Id.* at 75:1914-1919. Plaintiffs are thus reduced to arguing that polling-place closures have taken place in communities of color, which will result in voters showing up at the wrong precinct. [Doc. 1, ¶¶ 89, 116(6)].

Because SB 202's provisions on out-of-precinct voting are in the mainstream when compared to other states, Plaintiffs attempt to confuse the issue by citing dubious studies about polling place closures and voter confusion. Courts in this district have already ruled that polling-place closures are not traceable to Defendants. *Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ, Slip op. (Doc. 612) at 36-42. And Plaintiffs ignore the myriad ways Georgia reduces potential voter confusion, including hosting a website where

---

[12] *Provisional Ballots*, National Conference of State Legislatures (September 17, 2020) *available at* https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx#partial

voters can look up their correct polling place and the increased notification requirements for changes to polling places in SB 202. Ex. A at 30:741-757, 60:1525-1558. Thus, Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. *See* Section II, B. 1. Given all of the opportunities to vote ahead of Election Day and the "safety valve" of counting out-of-precinct votes if the voter arrives after 5:00 P.M. and cannot get to his or her home precinct, any burden is minimal at best and justified by the State's interests in minimizing burdens on election workers and minimizing lines at polling places. *Ohio Democratic Party*, 834 F.3d at 630. As a result, both the intentional-discrimination claim and fundamental-right-to-vote claim fail.

### 6.   *Lines/line warming prohibition (Counts I, II, and III).*

Plaintiffs next focus on the prohibition on third parties giving anything of value to voters in line, claiming disparate impact because they say lines are longer in minority areas. [Doc. 1, ¶¶ 71, 91, 116(7), 133, 152]. But the General Assembly explained that "many groups" approached voters in line during the 2020 elections and clarified the rules around electioneering within 150 feet of a polling place because of the importance of "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote." Ex. A at 6:126-129. This is not unusual among states and campaign speech can be restricted near polling locations and precincts. *Minn. Voters*

*Alliance v. Mansky*, 138 S. Ct. 1876, 1886 (2018); *Burson v. Freeman,* 504 U.S. 191, 193-94 (1992). The regulatory interests of the state amply justify the minimal burden of a voter not being approached with an offer of food or drink within 150 feet.[13] *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124. This dispatches Plaintiffs' constitutional claim.

The sole allegation of a disparate racial impact related to this provision is that voters of color tend to wait in longer lines. [Doc. 1, ¶¶ 71, 91, 116(7), 133, 152]. But, as noted above, long lines are not an injury traceable to State Defendants. *Anderson*, 2020 U.S. Dist. LEXIS 188677, at *64. Without this causal connection, the Section 2 claim against the prohibition evaporates. *Greater Birmingham Min*., 992 F.3d at 1329.

The intentional-discrimination claim also fails because Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266, based solely on the concept that minority voters wait in lines that are not traceable to Defendants. *See* Section II, B. 1.

---

[13] Voters can still receive water from a cooler stationed within the 150-feet buffer, receive unlimited food and water outside of 150 feet, and SB 202 specifically requires election officials to make changes to avoid long lines during in-person voting. Ex. A at 74:1887-1889; 29:721-734.

7.    *Removal of voting powers from the Secretary on SEB and providing accountability for county officials (Count I).*

Finally, Plaintiffs claim that changes to the makeup of the State Election Board and the power to temporarily replace county election officials are intentionally discriminatory. [Doc. 1, ¶ 72, 116(8)]. But Plaintiffs cannot demonstrate that this statutory change, which was designed to allow state officials to address "long-term problems" in counties with "dysfunctional election systems," Ex. A at 5:96-101, is facially unconstitutional. *Washington State Grange*, 552 U.S. at 449. Not only has the system not yet been used, but Plaintiffs have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. The sole alleged racial impact is that the SEB has the power to "target" jurisdictions with large populations of voters of color, which is not a sufficient basis on which to rest an intentional-discrimination claim. *Greater Birmingham Min.*, 992 F.3d at 1321-1328.

## CONCLUSION

SB 202 made commonsense changes based on lessons learned from voting in a pandemic. Ex. A at 4:76-78. The clear aim of the legislature was to increase early voting access across the state, reduce voter confusion, reduce lines, and increase confidence in the results of Georgia's elections. This Court should dismiss Plaintiffs' Complaint.

Respectfully submitted this 14th day of May, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Erik Jaffe*
ejaffe@schaerr-jaffe.com

H. Christopher Bartolomucci*
cbartolomucci@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC  20006
Telephone: (202) 787-1060
Fax: (202) 776-0136

*Pro hac vice* motions pending

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of Defendants' Motion to Dismiss has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson
