UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA STATE CONFERENCE
OF THE NAACP, et al.,

        Plaintiffs,

      v.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State for the State of Georgia, et al.,

        Defendants.

CIVIL ACTION NO.
1:21-cv-01259-JPB

## **ORDER**

Before the Court are the following motions:

1. Defendants Brad Raffensperger, Rebecca Sullivan, Sara Tindall Ghazal, Matthew Mashburn and Anh Le's (collectively "State Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 42);

2. Defendants the county boards of election and registration for Fulton, Gwinnett and Cobb Counties' (collectively "County Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 52); and

3. Defendants Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc.'s (collectively "Intervenor Defendants") Motion to Dismiss (ECF No. 53).[1]

---

[1] State Defendants, County Defendants and Intervenor Defendants are collectively referred to as "Defendants."

Having fully considered the papers filed therewith, the Court finds as follows:

## I.   **BACKGROUND**

Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, Lower Muskogee Creek Tribe and Urban League of Greater Atlanta, Inc. (collectively "Plaintiffs") filed this action seeking a declaration that certain provisions of Georgia Senate Bill 202 ("SB 202") violate the United States Constitution, the Voting Rights Act and/or the Civil Rights Act.[2]

Governor Brian Kemp signed SB 202 into law on March 25, 2021, and the challenged provisions regulate election-related processes and activities ranging from absentee ballot voting to out-of-precinct in-person voting.  Plaintiffs oppose the specified regulations on the following grounds:  discrimination, undue burden on the right to vote, immaterial voting requirement and abridgement of free speech, expression and association.

## II.   **DISCUSSION**

County Defendants move to dismiss the Amended Complaint solely on standing grounds; Intervenor Defendants challenge Plaintiffs' claims on the merits

---

[2] Plaintiffs amended their Complaint on May 28, 2021.

only; and State Defendants seek dismissal both on standing grounds and on the merits.  The Court will address the standing question first.  *See Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) (stating that the Court is obligated "'to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based'" (quoting *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991))).

### A.    Standing[3]

To satisfy standing requirements under Article III of the United States Constitution, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

---

[3] Standing is jurisdictional, *see Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991), and a motion to dismiss for lack of standing can rest on either a facial or factual challenge to the complaint, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).  In evaluating a facial challenge, a court considers only the allegations in the complaint and accepts them as true, whereas in a factual challenge, a court considers matters outside the pleadings, such as testimony and affidavits.  *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).  Here, the parties do not reference matters outside the Complaint with respect to their standing arguments.  Therefore, the Court will evaluate State Defendants' standing argument as a facial challenge and will limit its analysis to facts alleged in the Complaint.

of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  These requirements ensure federal courts adjudicate only actual "cases" and "controversies."[4]  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

### 1.    Injury

"'[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts.'"  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  In *Common*

---

[4] "Where only injunctive relief is sought, only one plaintiff with standing is required."  *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *see also, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (finding that it was not necessary to consider the standing of other plaintiffs where standing was established as to one plaintiff); *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior . . . , has standing.").  Therefore, the Court's analysis will focus on one plaintiff for the purpose of deciding the instant motions to dismiss.

*Cause/Georgia*, the Eleventh Circuit Court of Appeals found that the plaintiff had established an injury sufficient to challenge a Georgia voting statute because the plaintiff planned to divert resources from its regular voter registration, mobilization and education activities to a campaign to educate and assist voters in complying with the new voter photo identification requirement under the challenged statute. *See id.* The court reasoned that this diversion constituted an adequate injury because it would cause the organization's noneconomic goals to suffer. *See id*. at 1350-51. Courts have found that a sufficient injury is demonstrated for standing purposes even when the diversion of resources is only "reasonably anticipate[d]." *E.g.*, *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (alteration in original) (internal punctuation and citation omitted).

Here, the Amended Complaint alleges that SB 202 will cause each plaintiff to divert resources away from its core activities to initiatives that will inform voters of and help them navigate SB 202's changes to the election process. For example, Plaintiff League of Women Voters of Georgia, Inc. ("League") asserts that it typically "work[s] for good government by studying issues, advocating for reforms, and, through the League's Observer Corps, observing and reporting on the work of all levels of government." Am. Compl. ¶ 42, ECF No. 35. "Many League members also assist with [get-out-the-vote] efforts, poll watching, and serving as

vote review panelists." *Id*. The League contends that SB 202 will cause it to divert "resources toward educating voters about [SB 202's] requirements" and "away from its regular advocacy, voter registration, fundraising, and other activities, [thereby] affecting its ability to operate and function with respect to its normal activities." *Id*. ¶ 46.

Based on these allegations, which mirror those asserted by the organization plaintiff in *Common Cause/Georgia*, the Court finds that the League has alleged a diversion of resources that is sufficient to show an injury for standing purposes.[5] *See Common Cause/Georgia*, 554 F.3d at 1350.

The Court is not persuaded by State and County Defendants' argument that Plaintiffs lack standing because their alleged diversion of resources is not "different in nature" from their current work and instead constitutes baseline work they are already doing. State Defs.' Br. 5, ECF No. 41-1. In *Common Cause/Georgia*, the court noted that one of the plaintiffs was "actively involved in voting activities" and planned to divert resources "to educate and assist voters" in complying with the challenged voting identification requirements. 554 F.3d at 1350. In finding that standing was established there, the court focused on the

---

[5] Notwithstanding this decision, Plaintiffs will be expected to prove at trial that they have indeed suffered an injury to be entitled to relief. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.21 (1982).

6

*diversion* of resources—the shifting of resources from one activity to another—as the essence of the inquiry and did not mention, much less impose, the counterintuitive requirement that the new activities must further a different purpose within the organization. *Id.* And, as stated above, a reasonably anticipated diversion of resources suffices.

Even the court in *Common Cause Indiana v. Lawson*, which State and County Defendants cite in support of their position, had a "hard time imagining" why "an organization would undertake any additional work if that work had nothing to do with its mission." 937 F.3d 944, 955 (7th Cir. 2019). In the end, the *Common Cause Indiana* court concluded that the voting advocacy organizations had established an injury for standing purposes by showing that they planned to expand voter education programs, among other things, to counter the effects of the challenged statute.[6] *Id.*

Additionally, State and County Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is misplaced. The Supreme Court of the United States in *Clapper* found that the plaintiffs lacked standing because the

---

[6] The only other case State and County Defendants cite in support of their argument—*Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett County Board of Registration and Elections*, 499 F. Supp. 3d 1231, 1240 (N.D. Ga. 2020)—is on appeal to the Eleventh Circuit.

future injury they identified was not certainly impending where they did not have

knowledge of the government's enforcement practices relating to the statute, and

they could not provide a credible basis for their fear of prosecution under the

statute. *Id*. at 411. Unlike in *Clapper*, the key standing question in this case is

whether the organization plaintiffs have demonstrated that SB 202 will cause them

to divert resources away from their normal activities, not whether they face

potential prosecution under SB 202.

The opinion in *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d

1332 (11th Cir. 2021), which State Defendants cite as an additional reason to find

that Plaintiffs lack standing in this case, similarly does not require a different

result. *Tsao* involved an "insubstantial," "non-imminent" and general threat of

identity theft to an individual as a result of a data breach. *Id.* at 1345. That type of

case is thus quite different from the instant pre-enforcement challenge to SB 202.

In any event, it is well settled that "an actual arrest, prosecution, or other

enforcement action is not a prerequisite to challenging [a] law." *Wollschlaeger v.*

*Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (internal punctuation

omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

To the contrary, "'the very purpose of the Declaratory Judgment Act'" is to

address the "[t]he dilemma posed by . . . putting the challenger to the choice

between abandoning his rights or risking prosecution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).  Therefore, courts allow a plaintiff to bring a pre-enforcement suit "when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (internal punctuation omitted) (quoting *Driehaus*, 573 U.S. at 159).  This type of injury is not considered too remote or speculative to support standing.  *See id*. at 1305.

## 2. Traceability and Redressability

It is well-settled that "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560).  Further, "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (internal punctuation omitted) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)).

Therefore, the court must be satisfied that a decision in the plaintiff's favor would "significantly increase the likelihood that [the plaintiff] would obtain relief that directly redresses the injury that she claims to have suffered." *Id.* (internal punctuation and alteration omitted) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)).

In *Luckey v. Harris*, which involved a complaint against the governor of Georgia and certain state judges regarding the state's provision of legal services to indigent criminal defendants, the Eleventh Circuit explained that "[a]ll that is required [for injunctive relief against a state official] is that the official [sued] be responsible for the challenged action." 860 F.2d 1012, 1015 (11th Cir. 1988). Thus, "the state officer sued must, by virtue of his office, have some connection with the unconstitutional act or conduct complained of.  Whether this connection arises out of general law, or is specially created by the act itself, is not material so long as it exists." *Id.* at 1015-16 (internal punctuation, alteration and citation omitted).  The court therefore concluded that prospective relief could be ordered against the judges because they were "responsible for administering the system of representation for the indigent criminally accused." *Id.* at 1016.

Relying on this "binding precedent" from *Luckey*, the Eleventh Circuit, in *Georgia Latino Alliance*, rejected the state officials' argument that the plaintiffs

did not have standing to sue because the state officials lacked enforcement

authority over the challenged statute.  691 F.3d at 1260 n.5.  The court emphasized

that it was "easily satisfied" that the plaintiffs met the traceability and

redressability requirements to bring a pre-enforcement challenge against the

officials, where "[e]ach injury [was] directly traceable to the passage of [the

challenged statute] and would be redressed by enjoining each provision" of the

statute.  *Id*. at 1260.

Following this reasoning, the Court finds that the traceability and

redressability requirements are satisfied in this case.  The injuries Plaintiffs allege

are directly traceable to SB 202, for which both State and County Defendants have

enforcement responsibility.  Although State Defendants argue that certain

provisions of SB 202 are handled at the county level, that does not necessarily

mean that they lack enforcement authority with respect to those provisions.

County Defendants' argument that SB 202's provisions are not traceable to

them and cannot be redressed by entering an injunction against them is similarly

without merit.  Notably, they do not dispute Plaintiffs' assertion that county

officials are directly responsible for enforcing numerous election administration

provisions of SB 202—from the new absentee ballot application and voting

requirements to voter registration challenges.

11

Further, County Defendants have not cited any authority that supports their argument that Plaintiffs cannot establish redressability without bringing suit against all Georgia counties. *Bush v. Gore*, 531 U.S. 98 (2000), which County Defendants cite, is inapposite because that opinion did not analyze standing. Rather, the Supreme Court addressed the manual recount of paper ballots in a Florida election and the related issue of disparate treatment of voters across the state under the Equal Protection Clause of the Fourteenth Amendment. *Id*. at 107. Those circumstances are easily distinguishable from County Defendants' redressability argument.

Regardless, to satisfy redressability requirements for standing purposes, Plaintiffs need to show only that an injunction against County Defendants would address at least some of the alleged injuries in this case. *See Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (finding that the plaintiff had standing to sue the defendant even if only "a small part of the [total] injury [was] attributable to" the defendant). They have fulfilled that requirement.

Based on the foregoing analysis, the Court finds that the Article III standing requirements to bring this suit are satisfied by at least the League.

### B.    Failure to State a Claim

Having resolved the threshold standing issue, the Court now turns to Defendants' arguments that the Amended Complaint fails to state a claim upon which relief may be granted.

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff."[7] *Traylor v. P'ship Title Co.*, 491 F. App'x 988, 989 (11th Cir. 2012).  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a complaint does not suffice "if it tenders 'naked assertions' devoid of 'further factual enhancement'" (alteration omitted) (quoting *Twombly*, 550 U.S. at 557)).

---

[7] A court is limited to reviewing what is alleged "'within the four corners of the complaint.'"  *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)).  If the court accepts matters outside the complaint, it "must convert the motion to dismiss into one for summary judgment." *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985).

Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "This standard does not require a party to plead facts with such particularity to establish a significant probability that the facts are true, rather, it requires a party's pleading of facts to give rise to a 'reasonable expectation that discovery will reveal evidence [supporting the claim].'"  *Burch v. Remington Arms Co.*, No. 2:13-cv-00185, 2014 WL 12543887, at *2 (N.D. Ga. May 6, 2014) (alteration in original) (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 570 (dismissing complaint because the plaintiffs did not state facts sufficient to "nudge[] their claims across the line from conceivable to plausible").

At bottom, the complaint must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *Traylor*, 491 F. App'x at 990 (quoting *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010)).

The Court will now address the question of whether Plaintiffs have satisfied

their pleading burden with respect to each count of the Amended Complaint.[8]

    **1.**    **Count I (intentional discrimination under the Fourteenth and Fifteenth Amendments and § 2 of the Voting Rights Act ("VRA"))[9]**

Plaintiffs allege that SB 202 was enacted with "a racially discriminatory

purpose in violation of [§] 2 of the [VRA] and the Fourteenth and Fifteenth

---

[8] State Defendants address the challenged provisions individually rather than in connection with the specified counts of the Amended Complaint. This approach, however, analyzes the challenged provisions out of context and does not account for Plaintiffs' contention that the challenged provisions also collectively violate the law. For the purpose of deciding the instant motions, the Court will evaluate each count as a whole and determine whether Plaintiffs have stated a claim as to the specific count.

[9] Complaints seeking to invalidate a voting statute on the grounds that it is discriminatory typically allege claims under § 2 of the VRA and/or the Fourteenth and Fifteenth Amendments. *See, e.g., Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021). VRA § 2 claims generally constitute allegations of vote dilution (*e.g.*, challenges to election districting schemes) or vote denial (*e.g.*, challenges to time, place or manner restrictions on voting, such as absentee and in-person voting rules). Either type of claim may be asserted as a discriminatory purpose/intent claim (*i.e.*, the statute was enacted with discriminatory intent and has a discriminatory effect) or a discriminatory results claim (*i.e.*, the statute results in the abridgement of the right to vote under the circumstances). *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991). Claims brought under the Fourteenth and Fifteenth Amendment require proof of discriminatory intent and effect (whether in the vote dilution or vote denial context). *See Greater Birmingham*, 992 F.3d at 1328-29. Therefore, the analysis of Fourteenth and Fifteenth Amendment discriminatory intent claims mirrors that of § 2 intent claims. In this case, Plaintiffs make vote denial allegations, which are styled as § 2 and Fourteenth and Fifteenth Amendment discriminatory intent claims (Count I) and a § 2 results claim (Count II).

Amendments."[10]  Am. Compl. ¶ 177, ECF No. 35.  Specifically, Plaintiffs assert

that:

> (i) "SB 202 was enacted at a time when Black voters and other voters of color were making increasing use of [the] means of voting that are being limited and restricted in SB [202]";
>
> (ii) "SB 202 was enacted immediately following elections in which the size of the population of Black voters and other voters of color, particularly when compared to the diminishing share of the white vote, had become larger in statewide elections";
>
> (iii) "[i]n passing SB 202, the Georgia legislature deviated from procedural norms [and] rush[ed] the bill to passage"; and
>
> (iv) "[t]he Chair of the House Committee on Public Integrity made culturally insensitive statements in connection with the passage of SB 202."

*Id*. ¶¶ 181-83, 185.

Other paragraphs in the Amended Complaint expound on these points.  For

example, Plaintiffs also allege that:

> (i) "there was a 25% increase in Black voter registration [for the 2020 and 2021 elections] compared to 2016";

---

[10] Courts generally analyze discriminatory intent or purpose claims under the framework the Supreme Court established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68 (1977). However, *Arlington Heights* did not involve a voting statute, so it does not track or refer to the language of § 2.  Discriminatory results claims, on the other hand, are usually analyzed under the framework the Supreme Court developed in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).  *Gingles* involved a vote dilution claim, and the relevant analysis incorporates the text of § 2.

(ii) "nearly 30% of Black voters cast their ballot by mail, with Black voters accounting for almost 32% of absentee ballot requests" compared to "only roughly 24% of white voters vot[ing] through the mail";

(iii) Chairman Fleming of the House of Representatives Special Committee on Election Integrity "publicly likened absentee ballots to the 'shady part of town down near the docks' where the 'chance of being shanghaied' is significant";

(iv) Chairman Fleming prohibited certain organizations from commenting on the bill while it was being considered in the House; and

(v) draft versions of SB 202 were sometimes taken up in the House without first providing a copy of the bill to the public or giving proper notice of the agenda.

*Id.* ¶¶ 111-31.  The Amended Complaint ultimately concludes that SB 202 was "intended to, and will" "disproportionately and adversely affect[] the right to vote of Black voters and other voters of color."  *Id.* ¶ 179.

State Defendants argue that Plaintiffs' intentional discrimination claim should be dismissed because the alleged impact of the challenged provisions "is minimal at best, the history relied on is far distant, the legislation went through normal channels, the legislature explained exactly what it was doing in the first pages of the bill[] and none of the statements by the legislature were racially discriminatory."  State Defs.' Br. 12-13, ECF No. 42-1 (citations omitted).

Intervenor Defendants make similar arguments but also contend that the Court should focus on the legislative findings underlying SB 202, which they assert are "the only reliable evidence of *the legislature's* purposes."  Intervenor

Defs.' Br. 15, ECF No. 53-1.  In their view, those findings prove that SB 202 was not enacted with discriminatory intent.  They argue that, at worst, the legislature was driven by the permissible purpose of securing partisan advantage.  *Id*. at 17.

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Supreme Court of the United States identified a non-exhaustive list of factors that courts can use to evaluate whether government action was undertaken with discriminatory intent.[11]  429 U.S. 252, 267-68 (1977).  These include the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" in taking the action; "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body"; and whether the "impact of the official action . . . bears more heavily on one race than another."  *Id*.

Because the aforementioned allegations in the Amended Complaint are consistent with the *Arlington Heights* factors and otherwise bear on the issue of intentional discrimination, the Court finds that Plaintiffs have stated a plausible

---

[11] State and Intervenor Defendants do not dispute that *Arlington Heights* governs Plaintiffs' discriminatory purpose claim.

18

discriminatory purpose claim.[12]  At the motion to dismiss stage, Plaintiffs are not required to establish "a significant probability that the facts are true," *Burch*, 2014 WL 12543887, at *2, and only have to state facts sufficient to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. They have done so here.

State and Intervenor Defendants' arguments, which attack the validity of Plaintiffs' allegations, are premature at this stage because they go to the merits of the claim and not to the question of whether Plaintiffs have asserted a plausible claim for relief.

Additionally, contrary to State and Intervenor Defendants' contentions that *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), established certain requirements that Plaintiffs failed to meet here, the Supreme Court in that case specifically "decline[d] . . . to announce a test to govern all VRA § 2 claims" involving time, place or manner voting restrictions, *id*. at 2336.  The Supreme Court explained that *Brnovich* was its "first foray" into deciding this type of claim and therefore found it "sufficient for present purposes to identify certain

---

[12] As noted above, Plaintiffs bring intent claims under § 2 as well as under the Fourteenth and Fifteenth Amendments.  Since all of these claims are analyzed in the same way, the Court's conclusion herein—that Plaintiffs have stated a claim for discriminatory intent—applies to the Fourteenth and Fifteenth Amendment intent claims as well as the § 2 intent claim.

***guideposts***" that led to its decision rather than to mandate a test that must be satisfied in all circumstances.  *Id*. (emphasis added).  Thus, while the language in *Brnovich* could portend future requirements to state or prove a § 2 time, place or manner claim, it should not be interpreted as currently setting forth pleading requirements that Plaintiffs must fulfill in this case.[13]

Likewise, while the Court acknowledges that the *Brnovich* opinion discusses the legislators' intent in passing the challenged statute, that analysis does not support State and Intervenor Defendants' position that *Brnovich* now requires plaintiffs in cases such as this one to allege that the legislature as a whole acted with discriminatory intent.  The Supreme Court's discussion of intent in that case occurred in the course of its review of whether the district court's interpretation of the evidence of discrimination was "permissible" under the clearly erroneous standard of review.  *Id*. at 2349.  The district court found no indication that the legislature "as a whole" was motivated by race, despite evidence in the record that a video reflecting a racial appeal played a role in the legislature's actions.  *Id*. at

---

[13] *Compare Guideline*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/guideline (last visited Dec. 6, 2021) ("an indication or outline of policy or conduct") *with Requirement*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/requirement (last visited Dec. 6, 2021) ("something essential to the existence or occurrence of something else"). "Guideline" and "Guidepost" are equivalent in the Merriam-Webster dictionary.

2349-50.  The Supreme Court concluded that the district court's finding was not

clearly erroneous.  *Id*.  When viewed in context, this finding does not establish a

new test to state a discrimination claim, especially in light of the Supreme Court's

express disavowal of doing so.

For all these reasons, the Court declines to dismiss Count I of the Amended

Complaint.[14]

### 2.    Count II (results claim under § 2 of the VRA)

Plaintiffs allege that the challenged provisions of SB 202 "individually and

collectively" result in the "political process in Georgia . . . not [being] equally open

to participation [by] Black voters and other voters of color."  Am. Compl. ¶ 199,

ECF No. 35.  They explain that this disparity is a result of the totality of the

circumstances, including "Georgia's history of racial discrimination in voting," *id*.

¶¶ 80-83, 196, racially polarized voting in Georgia, *id*. ¶¶ 92-110, and "the effects

---

[14] Citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), Intervenor Defendants argue that a presumption of good faith applies to the legislature's actions, and a history of voting discrimination cannot condemn all later actions by the state. Intervenor Defs.' Reply Br. 12, ECF No. 62.  However, *Abbott* does not address whether the presumption of good faith applies in vote denial cases.  And even if the presumption applies, it is not a shield that requires automatic dismissal of discrimination claims at the pleading stage.  *See Abbott*, 138 S. Ct. at 2324-25. The Court must analyze the Government's allegations under applicable law and consider the historical context as "'one evidentiary source.'"  *Id*. at 2325 (citation omitted).

of discrimination in education, employment, and health[, which] hinder [voters of color's] ability to participate effectively in the political process," *id*. ¶ 197.

In particular, Plaintiffs assert that "Georgia was the only state [subject to preclearance under the VRA] that . . . implemented voting restrictions in every category the [United States] Commission [on Civil Rights] examined"; "Black voters and other voters of color usually provide strong support to Democratic candidates"; and Black voters and other voters of color are more likely to live below the poverty line, lack a vehicle or computer access in their homes and have jobs that do not allow the flexibility to use certain voting options. *Id*. ¶¶ 82, 98, 103-07.

Intervenor Defendants, like State Defendants, rely in large part on *Brnovich* to challenge Plaintiffs' claims. They argue that the challenged provisions of SB 202 "impose nothing beyond the usual burdens of voting"; "Plaintiffs [improperly] focus on how each provision of SB 202 burdens a particular method of voting, without considering the [s]tate's entire [voting] system"; and "Plaintiffs misstate the strength of the state interests behind the challenged laws." Intervenor Defs.' Br. 12-14, ECF No. 53-1. Intervenor Defendants also contend that Plaintiffs have failed to assert certain facts required by *Brnovich*, including "how widespread SB 202's requirements (or similar ones) are in other [s]tates" and "the size (or any

meaningful comparison) of any racially disparate impacts."  Intervenor Defs.'

Reply Br. 3, ECF No. 62.

> A violation of § 2 of the VRA
>
> is established if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or election in the
> [s]tate or political subdivision are not equally open to participation by
> members of a [protected] class . . . in that [they] have less opportunity
> than other members of the electorate to participate in the political
> process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  To evaluate a results claim under § 2 of the VRA, courts

have relied on the factors that the Supreme Court identified in *Thornburg v.*

*Gingles*, 478 U.S. 30, 36-37 (1986), such as the extent of any history of

discrimination affecting the right to vote, the scope of racially polarized voting and

the degree to which discrimination hinders the class's ability to participate in the

voting process.[15]

However, the Supreme Court's opinion in *Brnovich* called into question the

usefulness of some of the *Gingles* factors in evaluating a vote denial claim under §

2 of the VRA.[16]  *Brnovich*, 141 S. Ct. at 2340.  The Supreme Court identified other

---

[15] Not all factors will be pertinent or essential to all claims.  *See Nipper v. Smith*,
39 F.3d 1494, 1526-27 (11th Cir. 1994).

[16] *Gingles* was a vote ***dilution*** case, wherein the plaintiff claimed that legislative
districting plans diluted the ability of particular voters to affect the outcome of
elections.  478 U.S. at 47.

relevant factors, but, as set forth above, it was careful to define those factors as mere guideposts.  *See id*. at 2336.  These guideposts include the size and degree of the burden on voting, the size of the disparities between the protected class and other groups, the opportunities provided by a state's voting system, etc.  *See id*. at 2336, 2338-39.  Because this list is neither exhaustive nor prescriptive, *Brnovich* does not require Plaintiffs to plead any specific set of factors.

Here, Plaintiffs' allegations identified above correspond with *Gingles* factors that may be relevant in this specific circumstance and ultimately weigh upon the issue of whether the political process in Georgia is equally open to all voters. Therefore, Plaintiffs have stated a plausible claim under § 2 of the VRA.

While State and Intervenor Defendants' arguments regarding the burden on voters, Georgia's voting system as a whole and Georgia's underlying interests in enacting SB 202 will likely be relevant to the analysis of Plaintiffs' claims at a later stage of this case, those contentions investigate the merits of the claims, and their resolution requires an inquiry into facts not alleged in the Amended Complaint.  Therefore, they are not appropriate at the motion to dismiss stage.

Further, as the Court explained above, the *Brnovich* factors are not prescriptive.  Therefore, contrary to Intervenor Defendants' position, Plaintiffs are not required to allege those factors or otherwise provide detailed facts regarding

24

them.  *See id.* at 2336; Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to provide only

"a short and plain statement of the claim showing that the pleader is entitled to

relief").

For all these reasons, the Court declines to dismiss Count II of the Amended

Complaint.

### 3.    Count III (undue burden on the right to vote under the First and Fourteenth Amendments)

Plaintiffs allege that the individual provisions of SB 202, as well as their

collective effect, impose "substantial burdens on Georgia's voters" and, "in some

cases[,] cause voters to risk being completely disenfranchised."  Am. Compl. ¶¶

209-10, ECF No. 35.  They explain that SB 202 makes it more difficult for certain

groups of voters to vote, including by changing the process for requesting and

voting absentee ballots and increasing the probability that such ballots will be

rejected, *see, e.g.*, *id.* ¶¶ 134, 140; limiting the availability of alternative voting

options, such as early in-person voting, *see, e.g.*, *id.* ¶¶ 147-52; and changing the

rules for accepting out-of-precinct votes, *see, e.g.*, *id.* ¶¶ 159-61.  Plaintiffs further

allege that "[n]o legitimate state interest justifies [SB 202's] significant restrictions

and burdens" and that the state's "purported goals of increasing confidence in

elections or encouraging uniformity are pretextual at best."  *Id.* ¶¶ 211-13.

State Defendants argue, among other things, that "Plaintiffs have not pleaded any burden under [the] *Anderson/Burdick* [framework for evaluating voting rights claims] because Georgia has numerous options for voters to cast their ballots and request absentee ballots," and the state's interest underlying the challenged provisions "more than outweighs any burden" the provisions impose on voters.  State Defs.' Br. 14, ECF No. 42-1.

Intervenor Defendants additionally argue that because "[m]ost of the challenged provisions of SB 202 regulate only absentee voting," "the right to vote is not at stake here."  Intervenor Defs.' Br. 3, ECF No. 53-1 (internal punctuation omitted).  They also argue that "[t]he only burdens that Plaintiffs assert are legally irrelevant because they are special burden[s] on some voters, not categorical burdens on all voters." *Id*. at 6.

In resolving an undue burden on voting claim, a court must:  (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v.*

*Celebrezze*, 460 U.S. 780, 789 (1983).  The analysis is not a "litmus-paper test" and instead requires a "'flexible'" approach.  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citation omitted).  If a court finds that a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance.  But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal punctuation and citation omitted).

Here, the Amended Complaint contains detailed allegations of burdens that Plaintiffs assert the challenged provisions will impose on Georgia voters. Plaintiffs also maintain that there are no legitimate state interests that would support such burdens.  *Anderson* and *Burdick* do not require more from Plaintiffs at the motion to dismiss stage.  Because State and Intervenor Defendants' weighing of the alleged burden on voters relies on facts not asserted in the Amended Complaint, such analysis is not appropriate at this time.

The Court also declines, as Intervenor Defendants suggest, to forego the undue burden analysis the Supreme Court developed in *Anderson* and *Burdick* and summarily dispose of Plaintiffs' voting rights claims.  The Court does not read

*McDonald v. Board of Election Commissioners*, 394 U.S. 802, 807-08 (1969),

which states that there is no right to an absentee ballot, to require such an outcome.

As discussed above, the *Anderson-Burdick* framework requires the Court to

evaluate the type of burden imposed by the challenged provisions and apply the

corresponding level of review.  "Only after weighing [the designated] factors is the

reviewing court in a position to decide whether the challenged provision is

unconstitutional."  *Anderson*, 460 U.S. at 789.

For all these reasons, the Court declines to dismiss Count III of the

Amended Complaint.

### 4.    Count IV (freedom of speech and association under the First and Fourteenth Amendments)

Plaintiffs allege that SB 202 restricts and chills their core political speech by

preventing them from "encouraging" citizens to vote "through the distribution of

absentee ballot applications."  Am. Compl. ¶¶ 219-20, ECF No. 35.  Specifically,

the Amended Complaint alleges that SB 202 prohibits organizations from sending

out unsolicited absentee ballot applications to voters and places organizations at

risk of incurring "hefty criminal sanctions" or fines if they "attempt to help voters

request absentee ballots" or send an absentee ballot application to a voter who has

already requested or voted an absentee ballot.  *Id*. ¶¶ 142-43.  Plaintiffs also assert

that SB 202 "compel[s] them to include a confusing disclosure" on the absentee

ballot application forms that they provide to voters that "stat[es] that the form was not sent by a government entity." *Id*. ¶ 144.

State Defendants argue that Plaintiffs' First Amendment claims should be dismissed because distributing ballot applications to voters is not expressive conduct that implicates speech. Intervenor Defendants do not address this count of the Amended Complaint.

The First Amendment prohibits the enactment of laws that abridge the freedom of speech. *See* U.S. Const. amend. I. Therefore, governments generally "ha[ve] no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

Regulation of speech based on the topic discussed or the idea or message expressed is presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests. *See id*. at 165 (stating that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))). In the context of a political campaign, the Supreme Court in *McIntyre v.*

*Ohio Elections Commission* found that an Ohio statute improperly regulated speech where it required that publications intended to influence voters bear certain source identification information.  514 U.S. 334, 345-46 (1995).

In light of Plaintiffs' allegations that the challenged provisions limit organizations' ability to convey their message through absentee ballots and force them to include certain language on the absentee ballot applications that they do distribute, the Court finds that Plaintiffs have stated a plausible claim that the challenged provisions regulate or chill core political speech or expression.

The Court is not aware of any authority in this Circuit holding, as State Defendants contend, that distributing absentee ballots *per se* cannot be considered expressive conduct under the First Amendment.  *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020)—the only case in State Defendants' brief that touches on this question—is out-of-Circuit, inapposite and does not go as far as State Defendants argue.

As an initial matter, that case was decided on a motion for preliminary injunction, which requires a court to look beyond the allegations in the complaint and evaluate whether the plaintiff has shown a likelihood of success on the merits of the claim.  That type of inquiry into the merits of Plaintiffs' allegations is neither required nor proper at this stage of the litigation.

Moreover, the *Lichtenstein* court did not declare a *per se* rule that would be applicable in all circumstances.  The court acknowledged that "whether [the] distribution [of absentee ballots] actually is speech in a particular situation depends on what is being distributed, why it is being distributed, and how such distribution would reasonably be perceived."  *Id*. at 766-67.  Then the court "place[d] itself in the position of a hypothetical intended recipient" and tried "to objectively gauge whether there is a great likelihood that such a person would understand the message" the absentee ballot distributors intended to convey.  *Id*. at 767.  Noting that the issue was "fairly close," the court concluded that "an intended recipient would understand the distribution to him or her as merely a means to carry out [the] otherwise-conveyed message" of encouragement to vote.  *Id*.  As such, even if the Court were to consider the *Lichtenstein* opinion as persuasive authority, it is not a basis upon which to dismiss Plaintiffs' claims in this case.

For these reasons, the Court declines to dismiss Count IV of the Amended Complaint.

### 5.    Count V (freedom of expressive conduct under the First and Fourteenth Amendments)

Plaintiffs allege that SB 202 prohibits them from providing water or snacks "within 25 feet of any voter standing in line to vote at any polling place, thereby restricting line warming expression for hundreds of feet outside of the entrances to

polling places."[17]  Am. Compl. ¶ 166, ECF No. 35.  They claim that this provision "chill[s] protected expressive conduct and speech that supports . . . the act of voting."  *Id*. ¶ 225.  Plaintiffs further assert that the restriction is content-based and that it applies in a public forum without the requisite compelling government interest.  *See id*. ¶ 228.

State Defendants counter that because a polling area is restricted, government-controlled property set aside for the purpose of voting, the much lower reasonableness standard applies to any regulation of speech or expression therein. State Defs.' Br. 24, ECF No. 42-1.  They conclude that under that lower standard, SB 202's restrictions pass muster because they are reasonable in light of the state's "regulatory interests."  *Id*.

Intervenor Defendants make a similar argument and additionally contend that the First Amendment is not implicated because line warming "is conduct, not speech."  Intervenor Defs.' Br. 18, ECF No. 53-1.  They therefore assert that while the challenged provision will impose an "incidental" burden on speech, the statute should not be analyzed as one regulating speech.  *Id*.

---

[17] "Line warming" refers to the provision of refreshments, such as food and drinks, to voters standing in line to vote at a polling place.  *See* Am. Compl. ¶ 166, ECF No. 35.

Taking as true Plaintiffs' allegations that SB 202 establishes what type of conduct and communication is permissible while engaging with voters who are waiting in line and construing those allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that SB 202's restrictions on line warming impinge on speech and/or expressive conduct in some way.

State Defendants do not provide support for their contention that any voting line would presumptively occur in a non-public forum, where a lower standard of review would apply.  Nor do Intervenor Defendants cite any authority for the proposition that line warming *per se* cannot be considered expressive conduct under the First Amendment.  Indeed, Intervenor Defendants concede that line warming could impose some burden on speech.

In any event, answering the questions of whether line warming occurs in a public versus a nonpublic forum; whether the associated speech or conduct is of the type protected by the First Amendment; what standard of review should apply; and whether the state has identified interests sufficient to meet the requisite standard requires the type of substantive merits inquiry that is not appropriate on a motion to dismiss.

For all these reasons, the Court declines to dismiss Count V of the Amended

Complaint.

### 6. Count VI (immaterial voting requirement under 52 U.S.C. § 10101(a)(2)(B))

Plaintiffs allege that the provisions of SB 202 requiring voters to provide

their date of birth with their absentee ballot applications and their voted absentee

ballots violate 52 U.S.C. § 10101(a)(2)(B) because they "require[] county election

officials to reject absentee ballot applications and [voted] absentee ballots based on

a failure to provide exactly matching information . . . that is not material to

determining whether individuals are qualified to vote."  Am. Compl. ¶ 237, ECF

No. 35.

State Defendants respond that a voter's date of birth could be material in the

context of absentee ballot voting and that regardless, the provisions do not violate

§ 10101(a)(2)(B) because they require notice to the voter and an opportunity to

cure the defect before an absentee ballot can be rejected.  *See* State Defs.' Br. 13,

ECF No. 42-1.  Intervenor Defendants do not address this count of the Amended

Complaint.

Under § 10101(a)(2)(B),

[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other

act requisite to voting, if such error or omission is not material in
determining whether such individual is qualified under [s]tate law to
vote in such election.

Plaintiffs have alleged that date of birth information is not necessary to determine

whether a person is qualified to vote, yet SB 202 requires county officials to reject

absentee ballot applications and voted ballots of voters who make errors in

providing such information.  As such, the Court finds that Plaintiffs have stated a

plausible claim for relief under § 10101(a)(2)(B).

State Defendants have not provided any support for their argument that the

opportunity to cure an error rehabilitates any potential violation of §

10101(a)(2)(B), and the statute is silent on this point.  This argument would also

require the Court to incorrectly address the merits of Plaintiffs' allegations at the

motion to dismiss stage.

For these reasons, the Court declines to dismiss Count VI of the Amended

Complaint.

III.   **CONCLUSION**

Based on the foregoing analysis, the Court **DENIES** Defendants' motions to

dismiss (ECF Nos. 42, 52, 53).

**SO ORDERED** this 9th day of December, 2021.

35

**J. P. BOULEE**
United States District Judge