UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:21-mi-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRIAN KEMP, *Governor of the State of Georgia, in his Official Capacity,* et al., <br> Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Intervenor-Defendants. | CIVIL ACTION NO. 1:21-cv-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, *in his official capacity as the Secretary of State for the State of Georgia,* et al., <br><br> Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE,  et al.*,* <br><br> Intervenor-Defendants. | CIVIL ACTION NO. 1:21-cv-01259-JPB |

## ORDER

This matter is before the Court on Plaintiffs'[1] Motion for a Preliminary Injunction Based on Immaterial Voting Requirements [Doc. 548]. This Court finds as follows:

## BACKGROUND

Georgia Senate Bill 202 ("S.B. 202") governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021. Plaintiffs, among other plaintiff groups, subsequently challenged various provisions of S.B. 202. At issue here is a provision in S.B. 202 that requires voters to print their date of birth on the outer envelope of an absentee ballot. The Court provides a brief factual overview below.

All Georgia voters are permitted to vote absentee by mail. To do so, a voter must first apply for an absentee ballot by completing an application form and submitting it to the appropriate county's registrar or absentee ballot clerk. The

---

[1] Plaintiffs represent two plaintiff groups in two cases. The plaintiffs from case no. 1:21-cv-1259 comprise the following: Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; GALEO Latino Community Development Fund, Inc.; Common Cause; and the Lower Muskogee Creek. The plaintiffs from case no. 1:21-cv-1284 are as follows: Georgia Muslim Voter Project; Women Watch Afrika; Latino Community Fund Georgia; The Arc of the United States; Sixth District of the African Methodist Episcopal Church; Delta Sigma Theta Sorority; Georgia ADAPT; Georgia Advocacy Office; and Southern Christian Leadership Conference.

application form requires an applicant to "provide his or her name, date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card."  O.C.G.A. § 21-2-391(a)(1)(C)(i).

Upon receipt of the absentee ballot application, the registrar or clerk verifies "the identity of the applicant" and determines "if the applicant is eligible to vote in the primary or election involved." Id. § 21-2-391(b)(1).  If the applicant is eligible to vote, the registrar or clerk sends that individual an absentee ballot. Id. § 21-2-391(b)(2).

When an absentee ballot is sent to a voter, the ballot is accompanied by two envelopes:  an inner envelope and an outer envelope. Id. § 21-2-385(a).  Once a voter votes his or her ballot, the voter must "fold the ballot and enclose and securely seal the same" in the inner envelope on "which is printed 'Official Absentee Ballot.'" Id.  Next, the voter shall place the inner envelope in the outer envelope. See infra Figure 1.  On the outer envelope, the voter must execute the oath and print his or her driver's license number or identification card number. O.C.G.A. § 21-2-385(a).  The voter must also "print his or her date of birth" (the "Birthdate Requirement"). Id.  Completing the outer oath envelope allows the

county election office to "verify that the absentee ballot was voted by the elector

who requested the ballot."  Id.



**Voter Identification**
Print carefully. This information will be used to
verify your identity before counting your ballot.

My date of birth *(MM/DD/YYYY)* _____

Number of my Georgia driver's license or state identifi-
cation card issued by the Department of Driver Services

OR  ☐ I do not have a Georgia driver's license or ID.
The last 4 digits of my
Social Security No. are

OR  ☐ I do not have a Georgia driver's license or ID
or a Social Security Number **AND**
I have placed in this envelope a copy of one of
the forms of identification listed in the absentee
ballot instructions.

*Figure 1:  The Outer Envelope.*

After the absentee ballot is returned, the registrar or clerk compares the

elector's driver's license number (or state identification card number) and the

elector's date of birth, as printed on the outer envelope, with the information

contained in voter registration records.  Id. § 21-2-386(a)(1)(B).  The registrar or

clerk also confirms that the elector signed the oath.  Id.  If the oath is signed and

the information matches the voter registration records, the registrar or clerk

certifies that the requirements are met, and the elector's name is added to the list of

absentee voters in a particular precinct.  Id.  If an elector "has failed to sign the oath, or if the identifying information on the absentee ballot envelope does not match the same information appearing in the elector's voter registration record," the registrar or clerk rejects the ballot.  Id. § 21-2-386(a)(1)(C).  When a ballot is rejected, the registrar or clerk promptly notifies the voter of the rejection, and the voter is given the opportunity to cure the defect.  Id.

Plaintiffs filed complaints against Georgia state officials[2] ("State Defendants") and counties[3] ("County Defendants") challenging the Birthdate Requirement.[4]  Specifically, Plaintiffs contend that the Birthdate Requirement violates § 1971 of the Civil Rights Act of 1964.  Section 1971 is known as the "Materiality Provision."

On May 17, 2023, Plaintiffs filed the instant motion seeking to enjoin all defendants "from rejecting absentee ballots based on any error or omission relating to [S.B.] 202's requirement of birthdates on ballot return envelops."  [Doc. 548-1,

---

[2] This list includes Brian Kemp, Governor of the State of Georgia, in his official capacity; Brad Raffensperger, Secretary of State of Georgia, in his official capacity; and individual members of the Georgia State Elections Board, in their official capacities.

[3] The complaints name as defendants the boards of elections and registration (as well as members of those boards) from the following counties:  Bibb, Chatham, Clarke, Clayton, Cobb, Columbia, DeKalb, Fulton, Gwinnett, Hall and Richmond.  The master docket contains a complete list of County Defendants.

[4] Although Plaintiffs challenged other provisions of S.B. 202, those challenges are not at issue here.

p. 7].  Plaintiffs further ask the Court to order "the Secretary of State to count such ballots and refuse certification of election results until all such ballots have been counted."  Id.  State Defendants and Intervenor Defendants[5] (collectively, "Responding Defendants") oppose the motion.  As to County Defendants, the motion is unopposed.[6]  The motion is ripe for review.

## ANALYSIS

Plaintiffs seek a preliminary injunction in this case.  Before the Court can analyze whether Plaintiffs are entitled to this relief, the Court must determine whether Plaintiffs have standing.

### A.    Standing

State Defendants argue that Plaintiffs do not have standing to seek an injunction.[7]  "The constitutionally minimum requirements for standing are three-

---

[5] Intervenor Defendants are the Republican National Committee, the National Republican Senatorial Committee, the National Republican Congressional Committee and the Georgia Republican Party, Inc.

[6] County Defendants did not file a response to Plaintiffs' motion.  See LR 7.1(B) ("Failure to file a response shall indicate that there is no opposition to the motion.").

[7] In deciding whether Plaintiffs have standing, the Court "need not parse" the standing of each plaintiff so long as one of them can demonstrate standing.  See Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 1113–14 (11th Cir. 2022) (holding that because one plaintiff had standing, the court was not obligated to consider whether the other plaintiffs had standing to maintain the suit). Because injunctive relief is sought in two of the consolidated cases (1:21-cv-1259 and 1:21-cv-1284), the Court will analyze whether at least one named plaintiff from each case has standing.

fold." <u>Fla. State Conf. of NAACP v. Browning</u>, 522 F.3d 1153, 1159 (11th Cir. 2008). First, a plaintiff must show that he suffered an injury-in-fact. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). Second, a plaintiff must show that the injury was caused by a defendant's complained-of actions. <u>Id.</u> And third, a plaintiff must show that his injury or threatened injury is likely to be redressed by a favorable judicial decision. <u>Id.</u>

### 1.    Injury-in-Fact

Organizations can establish the injury-in-fact requirement in two ways: (1) through its own injury by showing a diversion of resources (organizational injury) or (2) through its members (associational standing). <u>Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections</u>, 36 F.4th 1100, 1114 (11th Cir. 2022).[8] Here, State Defendants assert that Plaintiffs cannot establish the required injury through either of these methods. The Court disagrees.

---

[8] According to State Defendants, Plaintiffs are required to show third-party standing, that is, that they have standing to assert the rights of third parties not before the Court. A plaintiff can establish third-party standing if the plaintiff demonstrates (1) an injury-in-fact to itself, (2) a close relationship to the third-party and (3) a hindrance to the third-party's ability to assert its own interests. <u>Young Apartments, Inc. v. Town of Jupiter</u>, 529 F.3d 1027, 1042 (11th Cir. 2008). However, third-party standing is not at issue when a plaintiff is a membership organization, like many of the organizations here. <u>See Browning</u>, 522 F.3d at 1158 (declining to address third-party standing where the plaintiffs were membership organizations suing on behalf of their members and had sufficiently shown the diversion of resources). This Court therefore does not address whether Plaintiffs have third-party standing in this case.

a.     **Organizational Injury**

As already stated above, an organization may establish an injury in fact by showing its own injury.  Ga. Ass'n of Latino Elected Offs., 36 F.4th at 114.  An organization typically makes this showing by relying on a "diversion of resources theory."  Id.  "Under this theory, an organization has standing 'if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'"  Id. (quoting Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1250 (11th Cir. 2020)).  It is not enough to simply state that resources were diverted.  Instead, "an organizational plaintiff must explain where it would have to 'divert resources away *from* in order to spend additional resources on combatting' the effects of the defendant's alleged conduct."  Id. (quoting Jacobson, 974 F.3d at 1250).

Plaintiffs presented evidence that both the Georgia State Conference of the NAACP ("Georgia NAACP") and the Georgia Muslim Voter Project ("GAMVP") diverted resources away from their ordinary programs in response to the Birthdate Requirement.  The Georgia NAACP is an organization that "works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, election protection, census participation, and get out of the vote ('GOTV') efforts."  [Doc.

548-12, p. 3].  Gerald Griggs, the president of the Georgia NAACP, explained that the Georgia NAACP has limited resources and has historically been a volunteer organization.  Id. at 3–4.  Griggs stated that because of changes to Georgia's election laws, including the institution of the Birthdate Requirement, the Georgia NAACP has had to make significant changes to its programs.  Id. at 4.  As just one example, Griggs asserted that the Georgia NAACP had to divert attention and resources away from veteran affairs programs and other similar initiatives and toward voter education efforts, including programs about how to cast an absentee ballot.[9]  Id. at 6.

Similar to the Georgia NAACP, the GAMVP is an organization that assists voters by holding voter registration drives and voter education sessions.  [Doc. 548-19, p. 3].  Shafina Khabani, the Executive Director for the GAMVP, explained that the GAMVP operates under a limited budget and that when the GAMVP chooses to expend resources on one activity, it is unable to conduct other activities to advance its mission.  Id.  According to Khabani, the GAMVP has had to expend additional resources on voter education and outreach to make sure voters understand the information and process required for completing an absentee ballot. Id. at 3–4.  Notably, Khabani contends that because of the Birthdate Requirement,

---

[9] Most of the named plaintiffs in case 1:21-cv-1259 submitted similar declarations.

the GAMVP diverted resources away from leadership development programs.  Id.
at 4.

The evidence before the Court establishes that both organizations diverted
their limited resources away from their ordinary programs to programs aimed at
educating voters about the absentee voting process.  Ultimately, the Court finds
that the injury-in-fact element of the standing analysis is satisfied in this case under
a diversion-of-resources theory.  See Browning, 522 F.3d at 1165–66 (holding that
the plaintiffs demonstrated an injury-in-fact because they diverted personnel and
time away from traditional activities to educating volunteers and voters on
compliance with the challenged regulation); Democratic Party of Ga., Inc. v.
Crittenden, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (finding that the plaintiffs
successfully established standing by showing that they diverted resources from
existing uses to assisting individuals impacted by rules concerning absentee
ballots).

### b.    Associational Standing

Plaintiffs also argue that they have associational standing.[10]  An organization
has associational standing "when its members would otherwise have standing to

---

[10] Although Plaintiffs' diversion of resources suffices to show an injury-in-fact, the Court
addresses the existence of associational standing in an abundance of caution.

sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Browning, 522 F.3d at 1160 (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000)).

The Court must first analyze whether Plaintiffs' members would have standing to sue in their own right.  In this case, State Defendants argue that Plaintiffs cannot satisfy this element because Plaintiffs have not identified any specific members who have had their absentee ballots rejected due to the failure to comply with the Birthdate Requirement.

"When the alleged harm is prospective," the Eleventh Circuit Court of Appeals has "not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future." Id.  "To satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of having his or her application rejected." Id. at 1163.

The alleged injury in this case is the rejection of an absentee ballot because of noncompliance with the Birthdate Requirement.  This injury will occur, if at all, at the next election.  Plaintiffs presented evidence that the Georgia NAACP has

approximately 10,000 members across the State of Georgia.  [Doc. 548-12, p. 3].

These members are located in nearly every county.  Id.  Plaintiffs also presented

evidence that since the enactment of S.B. 202, numerous ballots have been rejected

for the failure to comply with the Birthdate Requirement.  The below chart

compares the number of absentee ballots rejected due to the Birthdate Requirement

before and after the passage of S.B. 202 for a selection of counties:

| County | Pre-S.B. 202 | | Post-S.B. 202 | |
|---|---|---|---|---|
| | Nov. 2020 | Jan. 2021 | Nov. 2022 | Dec. 2022 |
| Athens-Clarke | 0 | 0 | 17 | 3 |
| Chatham | 0 | 0 | 25 | 49 |
| Cobb | 0 | 0 | 0 | 180 |
| Fulton[11] | 0 | 0 | 16–283 | 1–279 |
| Hall | 0 | 0 | 3 | 1 |
| Richmond | 0 | 0 | 21 | 13 |

See [Doc. 548-1, p. 13].  Given that the Georgia NAACP has around 10,000

members state-wide, it is highly unlikely "that not a single member will have his or

---

[11] Plaintiffs asked Fulton County to provide the number of absentee ballots rejected for a missing birthdate for the 2022 general election and the 2022 general runoff election. [Doc. 548-9, p. 7].  In its response, Fulton County stated that it rejected between 16 and 283 absentee ballots for the 2022 general election and between 1 and 279 for the 2022 general runoff election.  Fulton County explained that it gave a range of numbers because its record-keeping program only allows "one specific reason [for the ballot rejection] to be chosen on its drop-down menu."  Id. at 10.  For instance, if an absentee voter failed to provide both his date of birth and his social security number, the absentee ballot would be rejected.  The registrar or clerk rejecting the ballot, however, could indicate only one reason for the rejection in the record-keeping program.  Consequently, according to Fulton County, "[t]here is no accurate way to calculate how many applications were rejected" because an application could be rejected for multiple reasons.  Id.

her [ballot] rejected due to a mismatch." Browning, 522 F.3d at 1163.

Accordingly, the Court finds that "[t]his probable danger is sufficient to satisfy the

injury prong for associational standing." Democratic Party of Ga., 347 F. Supp. 3d

at 1337 (determining that the plaintiff had standing because the plaintiff

organization had "tens of thousands of members who are active voters in the state"

making it "extremely" unlikely that the law at issue would not affect a single

member).

     Having found injury, the Court must next consider whether the interests at

stake are germane to the Georgia NAACP's purpose.  This element is satisfied

because the Georgia NAACP's mission—to eliminate racial discrimination

through democratic processes—is germane to the interests at stake in this case,

namely, voting.

     Lastly, the Court must analyze whether the claim asserted or the relief

requested requires the participation of individual members in the lawsuit.  Because

Plaintiffs seek declaratory and injunctive relief, a decision favorable to Plaintiffs

will accrue to the benefit of their members, and therefore, no need exists for

individual joinder of any one member.  See Browning, 522 F.3d at 1160

(recognizing that when the relief sought is injunctive, individual participation of

the organization's members is not normally necessary).

For these reasons, the Court finds that Plaintiffs have sufficiently alleged that members of the Georgia NAACP would have standing to sue in their own right, the interests at stake are germane to the Georgia NAACP's purpose and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Accordingly, this Court is satisfied that Plaintiffs have established associational standing as to the Georgia NAACP.[12]

## 2.    Traceability and Redressability

Even where a plaintiff establishes a concrete injury, that plaintiff must also satisfy the traceability and redressability elements of standing. As to traceability, the Eleventh Circuit has held that "[t]he injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1115–16 (quoting Lujan, 504 U.S. at 560–61). Under the redressability element, "it must be 'likely,' as opposed to merely 'speculative,' that the injury

---

[12] As previously noted, the GAMVP has established organizational injury sufficient to show an injury in fact. The Court is not convinced, however, that the GAMVP or any of the other plaintiffs from 1:21-cv-1284 has shown associational standing. Plaintiffs did not present evidence that the GAMVP is a membership organization with members throughout the state. In their reply brief, Plaintiffs did present evidence concerning the Georgia Advocacy Office. Because this particular evidence was presented for the first time in the reply, it will not be considered. See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) ("It is well settled that a party cannot argue an issue in its reply brief that was not preserved in its initial brief.").

will be 'redressed by a favorable decision'" of the court.  <u>Lujan</u>, 504 U.S. at 561

(quoting <u>Simon v. E. Ky. Welfare Rts. Org.</u>, 426 U.S. 26, 38 (1976)).

In this case, Plaintiffs seek an order preliminarily enjoining all defendants—

presumably State and County Defendants alike—from rejecting absentee ballots

based on any error or omission relating to the Birthdate Requirement.  Plaintiffs

also ask the Court to enter an order requiring the Secretary of State to count such

ballots and refuse certification of election results until all such ballots have been

counted.  This Court must therefore determine whether Plaintiffs' claimed injury is

traceable to State Defendants and to County Defendants and whether this injury is

redressable by the relief Plaintiffs seek.

Georgia law commits the processing and verification of absentee ballots

solely to county officials.  <u>See generally</u> O.C.G.A. § 21-2-386.  The board of

registrars or absentee ballot clerk bears the responsibility to keep absentee ballots

safe, "unopened, and stored in a manner that will prevent tampering and

unauthorized access."  <u>Id.</u> § 21-2-386(a)(1)(A).  Upon opening a ballot, the

registrar or clerk compares the information on the outer envelope with the

information in the voter registration records.  <u>Id.</u> § 21-2-386(a)(1)(B).  Georgia law

requires that the board of registrars or clerk reject the ballot if any of the required

information is missing or does not match voter registration records.  Id. § 21-2-386(a)(1)(C).

Because county officials are responsible for accepting or rejecting absentee ballots, the Court easily concludes that as to County Defendants, Plaintiffs have met their burden to show traceability and redressability.  If a county official rejects a ballot because of a missing birthdate, then the voter's injury is traceable to that county official.  Specifically, a county official can redress Plaintiffs' alleged injuries by accepting absentee ballots with missing or incorrect birthdates.

The Court finds, however, that Plaintiffs' injury—the rejection of absentee ballots with missing or incorrect birthdates—is not redressable by an order directed to State Defendants, who are removed from the process of accepting or rejecting absentee ballots.  Plaintiffs argue that they have established traceability and redressability as to State Defendants because the Secretary of State "can ensure statewide compliance" with an order of this Court and has the power to "inspect and audit" absentee ballot envelopes.  [Doc. 595, p. 12].  The Court is not convinced.  The Secretary of State's ability to ensure compliance with judicial orders and to inspect and audit absentee ballot envelopes does not render the rejection of absentee ballots traceable to that office or to other State Defendants. See, e.g., Jacobson, 974 F.3d at 1254 ("[T]he Secretary's position as 'the chief

election officer of the state' with 'general supervision and administration of the election laws' does not make the order in which candidates appear on the ballot traceable to her." (citations omitted)).[13]  For these reasons, the Court finds that Plaintiffs have not shown that their harms are traceable to State Defendants.  As such, an order directed to State Defendants will not redress Plaintiffs' alleged injuries.  See id. at 1258 ("Because the Secretary will not cause any injury the voters and organizations might suffer, relief against her will not redress that injury—either 'directly or indirectly.'" (quoting Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019))).

* * *

For the reasons set forth above, the Court concludes that Plaintiffs have standing in this action to seek preliminary injunctive relief from County Defendants but that Plaintiffs lack such standing as to State Defendants.  As a result, if an injunction is warranted in this case, it will not issue against State Defendants.

---

[13] Although Jacobson concerned the Secretary of State of Florida, the Secretary of State of Georgia is likewise Georgia's chief election official.  See O.C.G.A. § 21-2-50.

**B.    Preliminary Injunction Standard**

A plaintiff seeking preliminary injunctive relief must show (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the balance of equities is in his favor; and (4) that an injunction would not be adverse to the public interest.  Sofarelli v. Pinellas County, 931 F.2d 718, 723–24 (11th Cir. 1991).  Because a preliminary injunction "is an extraordinary and drastic remedy," the Court may not issue such relief "unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Granting a preliminary injunction is thus the exception rather than the rule.  See id.

**1.    Likelihood of Success on the Merits**

To obtain a preliminary injunction, the moving party must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  Sofarelli, 931 F.2d at 723.  This factor is generally considered the most important of the four factors, see Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986), and failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, see Siegel, 234 F.3d at 1176.  In the analysis that follows, the Court

considers whether Plaintiffs have shown a substantial likelihood of success on their

claim that the Birthdate Requirement violates the Materiality Provision.

### a.    Application of the Materiality Provision

The Materiality Provision prohibits any "person acting under color of law"

from

> deny[ing] the right of any individual to vote in any election
> because of an error or omission on any record or paper relating to
> any application, registration, or other act requisite to voting, if
> such error or omission is not material in determining whether
> such individual is qualified under State law to vote in such
> election.

52 U.S.C. § 10101(a)(2)(B).  For purposes of the Materiality Provision, "voting" is

defined as the following:

> all action necessary to make a vote effective including, but not
> limited to, registration or other action required by State law
> prerequisite to voting, casting a ballot, and having such ballot
> counted and included in the appropriate totals of votes cast with
> respect to candidates for public office and propositions for which
> votes are received in an election.

Id. § 10101(e).

By way of background and as explained by the Eleventh Circuit, the

Materiality Provision was enacted to "counteract state and local government tactics

of using, among other things, burdensome registration requirements to

disenfranchise African-Americans."  Browning, 522 F.3d 1153, 1173 (11th Cir.

2008).  Indeed, the Materiality Provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." Schwier v. Cox, 340 F.3d 1284, 1294 (11th Cir. 2003).  A common example of this kind of practice was to "disqualify[] an applicant who failed to list the exact number of months and days in his age." Browning, 522 F.3d at 1173.  In the Eleventh Circuit's view, "[s]uch trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." Id.

As already stated above, the plain text of the Materiality Provision "prohibits denying the right to vote based on errors or omissions that are not material in determining voter eligibility." Id.  "The term 'material' . . . signifies different degrees of importance in different legal contexts." Id.  Notably, its definition can range from "one similar to minimal relevance" to one "closer to outcome-determinative." Id. at 1174.  Importantly, the Eleventh Circuit has held that in deciding whether an error or omission is "material" in this context, a reviewing court must ask whether, "accepting the error as true and correct, the information

20

contained in the error is material to determining the eligibility of the applicant."[14]
Id. at 1175.  In sum, if the error is not material to determining whether the voter is
eligible to vote, the law or procedure violates the Materiality Provision.

To evaluate whether the Birthdate Requirement violates the Materiality
Provision, this Court must assess whether requiring an individual's date of birth on
the outer envelope is material to determining whether that individual is qualified to
vote.  To be qualified to vote in Georgia, an individual must meet the following
requirements:  (1) be a citizen of the United States, (2) be at least eighteen years of
age, (3) be a resident of Georgia and of the county in which he or she seeks to vote,
(4) not have been convicted of a felony and (5) not have been declared mentally
incompetent.  O.C.G.A. § 21-2-216.  Notably, the determination of whether an
individual is *qualified* to vote occurs through the absentee ballot application
process and is therefore complete before a voter ever receives an absentee ballot.
Id. § 21-2-391(b)(1) (stating that upon receipt of the absentee ballot application,
the registrar or clerk verifies "the identity of the applicant" and determines "if the
applicant is eligible to vote in the primary or election involved").  Consequently,
when an individual provides his or her date of birth on the outer envelope of the

---

[14] Although this is the test set forth by the Eleventh Circuit, Responding Defendants
neither acknowledged this test nor explained how it applies to the instant case.

absentee ballot, that information is not used to determine whether the individual is qualified to vote.  In fact, to have received the ballot (and the envelope) in the first instance, that determination has necessarily already taken place.

State Defendants even admit that the Birthdate Requirement is not used to determine whether a voter is qualified to vote and is only used to verify the voter's identity.  [Doc. 582, p. 23].  In other words, the Birthdate Requirement is not used to ensure that the voter is at least eighteen years of age because the voter's age was already verified during the *application* process.  Thus, even if the voter did, in fact, write his or her correct birthdate on the outer envelope (i.e., even if the error were accepted as true), the birthdate is not material to determining whether the voter is qualified to vote.

Ultimately, these uncontroverted facts show that a voter's ability to correctly provide his or her birthdate on the outer envelope of an absentee ballot is not material to determining that voter's qualifications under Georgia law.  And yet, if an error or omission is made on the outer envelope, the absentee ballot will be rejected, and the vote not counted.  As a result, this Court finds that Plaintiffs have

established a substantial likelihood of success on the merits of their claim that the

Birthdate Requirement violates the Materiality Provision.[15]

### b.    Responding Defendants' Arguments

In addition to the standing arguments, Responding Defendants made various

arguments as to why Plaintiffs could not satisfy their burden to show a substantial

likelihood of success on the merits.  Responding Defendants primarily argue that

the failure to comply with the Birthdate Requirement does not deny an individual

the right to vote in an election and that completing the outer envelope is not an act

requisite to voting.  Responding Defendants additionally argue that because the

outer envelope is not used to determine a voter's qualifications, the Materiality

---

[15] Other courts have applied the Materiality Provision in the same manner.  Indeed, two other judges within this district have reached the same conclusion when asked to consider whether a similar birthdate requirement violates the Materiality Provision.  In <u>Martin v. Crittenden</u>, the district court was asked to enjoin Gwinnett County from rejecting absentee ballots on the sole basis of an omitted or incorrect birth year on an absentee ballot envelope.  347 F. Supp. 3d 1302, 1304 (N.D. Ga. 2018).  The <u>Martin</u> court entered an injunction after finding that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law" where election officials had already confirmed a voter's eligibility through the absentee ballot application process.  <u>Id.</u> at 1308–09.  In <u>Democratic Party of Georgia, Inc.</u>, the court reached the same result and adopted the reasoning of <u>Martin</u>.  347 F. Supp. 3d at 1341 ("[T]he Court finds that Plaintiffs have met their burden in showing a substantial likelihood of success on the merits with respect to their absentee mail-in ballot claims.").  Similarly, in <u>Ball v. Chapman</u>, the Supreme Court of Pennsylvania determined that the practice of rejecting absentee ballots because the return envelope was incorrectly dated or undated violated the Materiality Provision.  289 A.3d 1, 28 (Pa. 2023).

Provision does not apply in the first instance.  The Court addresses these

arguments in turn.[16]

> **i.      Whether Rejecting a Ballot Constitutes a Denial of the Right to Vote**

Responding Defendants argue that if a registrar or clerk rejects an absentee

ballot based on a missing or incorrect date of birth, the voter has not been denied

the right to vote.  Instead, even though the vote is not counted, Responding

Defendants' contend that the voter has forfeited his vote because the voter failed to

follow the process outlined in Georgia law for casting an absentee ballot.

Responding Defendants' position does not find support in the plain language

of the Materiality Provision.  Pa. State Conf. of the NAACP v. Schmidt, No. 1:22-

CV-339, 2023 WL 3902954, at *6 (W.D. Pa. June 8, 2023) (concluding that this

argument "runs afoul of the plain language of the statutory text").  As previously

stated, the Materiality Provision prohibits "deny[ing] the right of any individual to

vote in any election because of an error or omission on any record or paper relating

to any application, registration, or other act requisite to voting."  52 U.S.C. §

---

[16] State Defendants also argue that Plaintiffs are not entitled to injunctive relief because the Materiality Provision does not create a private right of action.  While a circuit split exists as to this issue, the Eleventh Circuit has already held that the Materiality Provision can be enforced by a private right of action under § 1983.  Schwier, 340 F.3d at 1297.  Given this binding precedent, the Court finds that this argument is without merit.

10101(a)(2)(B).  While Responding Defendants ask this Court to narrowly define

"the right of any individual to vote in any election," the Court cannot ignore that

Congress expansively defined "voting" as the following:

> all action necessary to make a vote effective including, but not
> limited to, registration or other action required by State law
> prerequisite to voting, casting a ballot, and having such ballot
> counted and included in the appropriate totals of votes cast with
> respect to candidates for public office and propositions for which
> votes are received in an election.

52 U.S.C. § 10101(e).  Significantly, the definition of "voting" includes having

one's ballot "counted and included in the appropriate totals of votes cast."  The

definition also includes "all action necessary to make a vote effective."  This Court

must presume that "Congress said what it meant and meant what it said."  CBS Inc.

v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir 2001).

Consequently, when determining whether the Materiality Provision has been

violated, the Court must look "not only for individuals being stripped of their

ability to exercise the right to vote generally, but for individuals who are denied the

right to have their ballots counted and included in the tallies for an individual

election."  Ball v. Chapman, 289 A.3d 1, 25 (Pa. 2023).  Ultimately, in light of the

express statutory definition of "voting," the Court finds that "invalidating ballots"

that do not comply with the Birthdate Requirement "denies an individual the right

of 'having such ballot counted and included in the appropriate totals of votes cast,'

and therefore 'den[ies] the right of an individual to vote in any election.'" Id. (first quoting 52 U.S.C. § 10101(e), then quoting § 10101(a)(2)(B)).  Responding Defendants' argument on this point is unavailing.[17]

### ii.  Whether Completing the Outer Envelope Is an "Act Requisite to Voting"

The Materiality Provision prohibits denying the right to vote because of an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting," where the error is not material in determining an individual's qualifications to vote.  52 U.S.C. § 10101(a)(2)(B).  State Defendants argue that completing the outer envelope is not an "act requisite to voting." Essentially, State Defendants contend that providing a date of birth on an envelope is not required or necessary for voting but is instead only necessary to vote absentee.

The text of the Materiality Provision does not distinguish between, for instance, "an act requisite to voting *absentee*" and "an act requisite to voting *in*

---

[17] Moreover, the Court is concerned that if Respondent Defendants' interpretation prevailed, the Materiality Provision would become superfluous.  In other words, no plaintiff could ever show a violation because "every 'error or omission' would constitute an elector's accidental forfeiture of his or her vote by failing to follow the rules for voting, rather than a denial of the 'right to vote' for which a state actor would be responsible." Ball, 289 A.3d at 25.  "The text draws no distinction between an 'error or omission' that would justify denying the right to vote and one that would not.  It does not differentiate between a requirement that has a valid purpose and one that does not." Id.

*person*." Instead, the statute prohibits the denial of the right to vote. As this Court explained above, Congress defined "voting" expansively. This Court is bound by the statutory text, which makes no distinction between acts requisite to the specific manner in which a voter submits his or her ballot. When a voter returns an absentee ballot to the clerk or registrar, the ballot contained in the inner envelope is the voter's vote, and completing the outer envelope is necessary for submission of that ballot. As such, returning the absentee ballot and completing the outer envelope is "requisite to, or essential to, completion of the act of voting." Pa. State Conf. of the NAACP, 2023 WL 3902954, at *7. In sum, the Court finds that completing the outer envelope is an "act requisite to voting" because without it, the vote will not count.

### iii. Whether the Materiality Provision Applies When the Outer Envelope Is Not Used to Determine a Voter's Qualifications

State Defendants contend that the Materiality Provision does not apply to this case at all because the paper or record at issue (the outer envelope) is not used to determine whether an individual is qualified to vote. As explained by Intervenor Defendants, "[i]t is not enough that the error or omission be immaterial to whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." [Doc. 583, p. 5] (quoting Ball, 289 A.3d

at 38 (Brobson, J., dissenting)).  Essentially, Responding Defendants claim that the Materiality Provision is not relevant to the Birthdate Requirement in the first instance because the outer envelope is not used to determine voter qualifications.

This reading of the Materiality Provision is too narrow.  Contrary to Responding Defendants' position, the fact that the outer envelope is not used to determine voter qualifications merely reinforces the immateriality of the Birthdate Requirement.  It has never been the law that the Materiality Provision only applies to that initial determination of whether a voter is qualified to vote.  Moreover, interpreting the Materiality Provision in the manner Responding Defendants suggest would essentially render the provision meaningless.  In other words, a state could impose immaterial voting requirements yet escape liability each time by arguing that the very immateriality of the requirement takes it outside the statute's reach.  At bottom, "[t]he Materiality Provision is implicated when a ballot is not counted because of an error on voting-related paperwork that is not material to determining qualifications of the voter." Pa. State Conf. of the NAACP, 2023 WL 3902954, at *7.  As this Court explained above, State Defendants' admission regarding the Birthdate Requirement "in fact establishes that the [Birthdate Requirement] is simply 'not material in determining whether such individual is

qualified' to vote." Ball, 289 A.3d at 25 n.139 (quoting 52 U.S.C. §

10101(a)(2)(B)).  The Court is unpersuaded by this final argument.

* * *

As set forth above, Plaintiffs have established that they are substantially

likely to succeed on the merits of their claim that the Birthdate Requirement

violates the Materiality Provision, and none of Responding Defendants' arguments

lead this Court to a different conclusion.  The Court now turns to the remaining

preliminary injunction factors.

### 2.    Irreparable Harm

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'"

Siegel, 234 F.3d at 1176 (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors v.

City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can

show a substantial likelihood of success on the merits, "the absence of a substantial

likelihood of irreparable injury would, standing alone, make preliminary injunctive

relief improper."  Id.; see also City of Jacksonville, 896 F.2d at 1285 (declining to

address all elements of the preliminary injunction test because "no showing of

irreparable injury was made").  Irreparable injury "must be neither remote nor

speculative, but actual and imminent."  Siegel, 234 F.3d at 1176 (quoting City of

Jacksonville, 896 F.2d at 1285).

Plaintiffs contend that they will be irreparably harmed if the Court does not enter an injunction. Specifically, Plaintiffs argue that so long as the Birthdate Requirement is in place, their organizations' missions "will continue to be frustrated and organization resources will continue to be diverted to assist with [the challenged law]." [Doc. 548-1, p. 24]. Plaintiffs also argue that irreparable harm exists because some of their members' ballots will go uncounted as a result of the Birthdate Requirement.

State Defendants assert that Plaintiffs failed to show irreparable harm for several different reasons. First, in State Defendants' view, the frustration of Plaintiffs' missions and the diversion of resources are not sufficient to show irreparable injury. Second, State Defendants contend that voters are not harmed if their absentee ballot is rejected for failure to comply with the Birthdate Requirement because the voter can cure the error or vote through other means. Third, State Defendants argue that Plaintiffs unduly delayed in bringing this motion.

As mentioned above, Plaintiffs assert that the continued diversion of resources amounts to irreparable harm. Without citing any authority, State Defendants seem to argue that irreparable harm cannot be shown by a continued diversion of resources. The Court disagrees. Plaintiffs presented evidence that

Plaintiffs' organizational missions will continue to be frustrated, and organizational resources will continue to be diverted to assist voters with the absentee ballot process if an injunction is not issued.  "Such mobilization opportunities cannot be remedied once lost." Ga. Coal. for People's Agenda, Inc. v. Kemp, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018).  Significantly, any monetary remedy cannot undo the injury alleged in this case.  See Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").  Ultimately, Plaintiffs' continued diversion of resources shows an irreparable harm.

Even more concerning to the Court is that one of Plaintiffs' member's absentee ballots might be rejected, and thus not counted, due to a failure to comply with the Birthdate Requirement.  It is well-settled than an infringement on the fundamental right to vote amounts to an irreparable injury.  Gonzalez v. Governor of Ga., 978 F.3d 1266, 1272 (11th Cir. 2020) (reaffirming that "missing the opportunity to vote in an election is an irreparable harm for the purposes of a preliminary injunction" (quoting Jones v. Governor of Fla., 950 F.3d 795, 828 (11th Cir. 2020))); League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . .  [O]nce the election occurs, there can be no do-

over and no redress.  The injury to these voters is real and completely irreparable if

nothing is done to enjoin the law."); see also Gwinnett Cnty. NAACP v. Gwinnett

Cnty. Bd. of Registration & Elections, 446 F. Supp. 3d 1111, 1125 (N.D. Ga.

2020) ("'A restriction on the fundamental right to vote . . . constitutes irreparable

injury.'" (quoting Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012))).

Ultimately, this Court finds that the potential infringement on the right to vote is

sufficient to establish irreparable injury.

State Defendants argue that Plaintiffs unreasonably delayed in filing the

instant motions and have thus not shown irreparable injury.  It is true that "[a]

delay in seeking a preliminary injunction of even only a few months—though not

necessarily fatal—militates against a finding of irreparable harm."  Wreal, LLC v.

Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016).  This is because

obtaining preliminary injunctive relief "requires showing 'imminent' irreparable

harm."  Id. (quoting Siegel, 234 F.3d at 1176–77).

In the Court's view, Plaintiffs did not unreasonably delay in requesting the

instant relief.  To obtain an injunction, Plaintiffs must establish that the harm is

imminent.  Moreover, Plaintiffs are simultaneously constrained by the Purcell

principle, which limits the window in which Plaintiffs may seek to enjoin election-

related regulations.  See infra Part C.  Here, Plaintiffs filed their motions in May

2023—ten months before the next elections.  Had Plaintiffs filed their motions earlier, their prospective harms would not have been imminent, but had they filed any later, their relief may have been barred by Purcell.

The Eleventh Circuit has held that a delay "*militates against* a finding of irreparable harm"—not that it precludes such a finding entirely.  Wreal, 840 F.3d at 1248.  Even if this Court determined that Plaintiffs delayed in bringing the instant motion, the Court would still need to weigh that finding against the Court's prior conclusion that Plaintiffs established irreparable injury in the form of the diversion of resources and the infringement of the right to vote.  And because "[d]enying an individual the right to vote works a serious, irreparable injury upon that individual," Common Cause/Ga. v. Billups, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005), it is unlikely that any delay in filing these motions—particularly considering the context of this case as one concerning election-related relief— would "militate against a finding of irreparable harm," Wreal, 840 F.3 at 1248. Consequently, for the reasons set forth above, the Court finds that Plaintiffs have established irreparable injury sufficient to support preliminary injunctive relief.

### 3.   Balance of the Equities and the Public Interest

The final two factors of the test for a preliminary injunction are the balance of the equities and the public interest.  Swain v. Junior, 958 F.3d 1081, 1090 (11th

Cir. 2020).  The Court combines its analysis of the final two factors of the preliminary injunction test because "where the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." Id. at 1091.  In the context of an election, the balance of the equities and the public interest factors are considered in tandem because "the real question posed . . . is how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast."  Curling v. Kemp, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). Ultimately, to conduct this analysis, a court must weigh (i) whether State Defendants' interests in conducting an orderly and efficient election and generally preserving the integrity of the electoral process outweigh the threat of injury to Plaintiffs and (ii) whether an injunction would be adverse to the public's interests, which merge with those of the state.  See Sofarelli, 931 F.2d at 723–24.

State Defendants argue that they will suffer irreparable harm if an injunction is issued because the Birthdate Requirement helps verify the identity of the voter casting the absentee ballot.  State Defendants therefore contend that an injunction "eliminating a tool for verifying the identity of voters who cast absentee ballots lowers the overall integrity of the election and risks introducing fraudulent ballots that would dilute lawful votes cast by Georgia voters."  [Doc. 582, p. 27].

The Court is not convinced that State Defendants' alleged harms are significant.  As an initial matter, a voter's identity can be verified without the Birthdate Requirement.  In fact, voters are required to provide their social security number and the number from their driver's license or state identification card on the outer envelope.  State Defendants fail to adequately explain why these verification methods are not sufficient to identify a voter.  Moreover, State Defendants did not present any evidence that absentee ballots rejected for failure to comply with the Birthdate Requirement were fraudulent ballots.  Given the evidence presented, the Court is simply not persuaded that eliminating the Birthdate Requirement risks introducing fraudulent ballots or threatens election integrity.

After carefully considering State Defendants' arguments, the Court finds that "none of the harm that [State] Defendants will allegedly suffer from an injunction rises to the same level as the harm that disenfranchised Plaintiffs (and, undoubtedly, other absentee voters) will suffer without an order from this Court." Martin v. Crittenden, 347 F. Supp. 3d 1302, 1310 (N.D. Ga. 2018).  Moreover, "the public interest is best served by allowing qualified voters to vote and have their votes counted." Id. at 1310–11.  Ultimately, the Court finds that an injunction requiring County Defendants to count absentee ballots with a missing or incorrect

birthdate is not so burdensome as to outweigh an individual's right to vote.  As such, Plaintiffs have established that the balance of the equities weighs in their favor and that an injunction would not be adverse to the public interest.

**C.    Application of the <u>Purcell</u> Principle**

The <u>Purcell</u> principle, first enunciated in <u>Purcell v. Gonzalez</u>, 549 U.S. 1 (2006), is the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election," <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 140 S. Ct. 1205, 1207 (2020).  This general rule recognizes that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." <u>Purcell</u>, 549 U.S. at 4–5.  When a court is asked to enter an injunction on the eve of an election, that court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." <u>Id.</u> at 4.  When <u>Purcell</u> applies to a request for an injunction, "the party seeking injunctive relief has a 'heightened' burden." <u>League of Women Voters of Fla., Inc. v. Fla. Sec'y of State</u>, 32 F.4th 1363, 1372 (11th Cir. 2022).

The <u>Purcell</u> principle applies only when an election is "sufficiently 'close at hand.'" <u>Id.</u> (quoting <u>Merrill v. Milligan</u>, 142 S. Ct. 879, 880 (2022) (Kavanaugh,

J., concurring)).  Although the Supreme Court of the United States has not squarely addressed precisely when Purcell applies, it has stayed an injunction for an election that was four months away.  See id. (citing Merrill, 142 S. Ct. at 879).  In other words, under the facts of that case, the Supreme Court determined that an election in four months was sufficiently "close at hand" that Purcell applied.

Similarly, the Eleventh Circuit has stayed an injunction pertaining to an election that was less than four months away.  Id.  Like the Supreme Court, the Eleventh Circuit found that the election was sufficiently "close at hand."  Id.  Notably, the Eleventh Circuit recognized that this particular application of Purcell was within Purcell's "outer bounds."  Id.  As to an election that was five months away, the Eleventh Circuit declined to stay an injunction because "[a]pplying Purcell to [that] case would extend the 'eve of an election' farther than [the court had] before."  Jacksonville Branch of NAACP v. City of Jacksonville, No. 22-13544, 2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022).  The first question for this Court is whether Plaintiffs' requested relief falls within the ambit of Purcell.

At this time, the earliest elections in Georgia are over six months away.  The Court finds that Purcell neither applies here nor bars the requested relief.  See GRACE, Inc. v. City of Miami, No. 1:22-CV-24066, 2023 WL 4602774, at *2

(S.D. Fla. June 7, 2023) (declining to apply <u>Purcell</u> "nearly six months prior to an election").[18]

## CONCLUSION

For the reasons explained above, the Motion for a Preliminary Injunction Based on Immaterial Voting Requirements [Doc. 548] is **GRANTED IN PART AND DENIED IN PART**. Insofar as Plaintiffs seek an injunction as to State Defendants, the Motion is **DENIED**. To the extent that Plaintiffs seek to enjoin County Defendants, the Motion is **GRANTED**. County Defendants are **HEREBY ENJOINED** from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement.

**SO ORDERED** this 18th day of August, 2023.

J. P. BOULEE
United States District Judge

---

[18] The Court notes that State Defendants do not argue that <u>Purcell</u> prevents the Court from entering an injunction. Intervenor Defendants contend, however, that <u>Purcell</u> applies. Intervenor Defendants assert that voter confusion would result if an injunction is issued because "voters have already voted with the birthdate requirement in place." [Doc. 583, p. 17]. Intervenor Defendants further contend that an injunction would require retraining. Intervenor Defendants' arguments are not supported by the record, and Intervenor Defendants provide no evidence that counting absentee ballots regardless of purported errors or omissions with respect to birthdates would result in confusion or substantial costs for training.