IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA STATE CONFERENCE OF THE
NAACP, as an organization; GEORGIA
COALITION FOR THE PEOPLE'S
AGENDA, INC., as an organization; LEAGUE
OF WOMEN VOTERS OF GEORGIA, INC.,
as an organization; GALEO LATINO
COMMUNITY DEVELOPMENT FUND,
INC., as an organization; COMMON CAUSE,
as an organization; LOWER MUSKOGEE
CREEK TRIBE,

Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
capacity of the Secretary of State for the
State of Georgia; JOHN FERVIER,
Chairman,  MATTHEW MASHBURN,
SARA TINDALL GHAZAL, EDWARD
LINDSEY, and DR. JANICE W.
JOHNSTON, in their official capacities as
members of the State Election Board;
PATRISE PERKINS-HOOKER, in her
official capacity as Chairwoman of the
FULTON County Registration and Elections
Board; AARON V. JOHNSON, MICHAEL
HEEKIN, and TERESA K. CRAWFORD, in
their official capacities as Members of the
FULTON County Registration and Elections
Board; WANDY TAYLOR, in her official
capacity as Chairwoman of the GWINNETT

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
Case No. 1:21-cv-1259-JPB

**SECOND AMENDED
COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

**52 U.S.C. § 10301, 42 U.S.C.
§ 1983; First, Fourteenth
and Fifteenth Amendments
to the United States
Constitution**

County Board of Registrations and Elections,  )
ALICE O'LENICK, LORETTA  )
MIRANDOLA, DAVID HANCOCK, and  )
ANTHONY RODRIQUEZ, in their official  )
capacities as Members of the GWINNETT  )
County Board of Registrations and Elections  )
TORI SILAS, in her official capacity as  )
Chairwoman of the COBB County Board of  )
Elections and Registration, JENNIFER  )
MOSBACHER, DEBBIE FISHER, STACY  )
EFRAT, and STEVEN F. BRUNING, in  )
their official capacities as Members of the  )
COBB County Board of Elections and  )
Registration,  )
 )
 Defendants.  )
 )

_____

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## PRELIMINARY STATEMENT

1.     This is a voting rights lawsuit filed pursuant to Section 2 of the Voting

Rights Act of 1965 (52 U.S.C. § 10301) and 42 U.S.C. § 1983[1] to protect

fundamental rights protected by the First, Fourteenth, and Fifteenth Amendments

to the United States Constitution.  Plaintiffs seek prospective declaratory and

injunctive relief against Brad Raffensperger, in his official capacity as the Georgia

Secretary of State;  John Fervier, Chairman, Matthew Mashburn, Sarah Tindall

Ghazal, Edward Lindsey, and Dr. Janice W. Johnston in their official capacities as

members of the State Election Board; Patrise Perkins-Hooker, in her official

capacity as Chairwoman of the Fulton County Registration and Elections Board;

Aaron V. Johnson, Michael Heekin, and Teresa K. Crawford, , in their official

capacities as Members of the Fulton County Registration and Elections Board;

Wandy Taylor, in her official capacity as Chairwoman of the Gwinnett County

Board of Registrations and Elections; Alice O'Lenick, Loretta Mirandola, David

Hancock, and Anthony Rodriquez, in their official capacities as Members of the

---

[1] Plaintiffs' counsel served a 90-day notice letter pursuant to Section 8 of the National Voter Registration Act of 1993 (52 U.S.C. § 20507, 20510) ("NVRA") on Defendants Raffensperger and members of the State Election Board. Once the 90-day notice period expires, Plaintiffs anticipate supplementing their claims with the NVRA claim.

Gwinnett County Board of Registrations and Elections; Tori Silas, in her official capacity as Chairwoman of the Cobb County Board of Elections and Registration; and Jennifer Mosbacher, Debbie Fisher; Stacy Efrat, and Steven F. Bruning in their official capacities as Members of the Cobb County Board of Elections and Registration, enjoining the enforcement and implementation of Georgia Senate Bill 202 ("SB 202"), an omnibus voter suppression bill passed by the Georgia General Assembly on March 25, 2021 and signed into law the same day by Georgia Governor, Brian Kemp.[2]

2.      SB 202 is the culmination of a concerted effort to suppress the participation of Black, Latinx, Asian American, members of indigenous populations and other voters of color by the Republican State Senate, State House, and Governor.  In the last two decades, Georgia has undergone demographic change, namely the increasingly large percentage of the electorate comprised of Black voters and other voters of color.  As demonstrated by election analyses, Black voters and voters of color usually provide strong support to Democratic candidates.  These demographic changes and voting patterns have resulted in

---

2.  A copy of SB 202 as passed by the Georgia General Assembly on March 25, 2021 ("SB 202/AP") is available on the Georgia General Assembly's website at this link: https://www.legis.ga.gov/api/legislation/document/20212022/201498 (last checked 1/17/2024).

corresponding political changes in Georgia.  After several cycles of Republican dominance, Democratic statewide candidates almost prevailed in 2018; Democrats then won the race for President in 2020 and two Senatorial contests in 2021. Republican legislators' immediate response was a legislative attempt to suppress the vote of Black voters and other voters of color in order to maintain the tenuous hold that the Republican Party has in Georgia.  In other words, these officials are using racial discrimination as a means of achieving a partisan end.  This is intentional discrimination in violation of the United States Constitution and Section 2 of the Voting Rights Act.

3.      SB 202's restrictions include: (1) onerous and unnecessary ID requirements in order to apply for or return absentee ballots; (2) prohibiting public employees and public entities from sending out unsolicited absentee ballot applications to voters; (3) threatening private individuals and non-public entities with potentially large fines for sending absentee ballot applications; (4) delaying and compressing the time during which a voter can request or submit an absentee ballot; (5) giving county registrars unfettered discretion to limit early voting hours to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting; (6) restricting the number of and access to absentee ballot drop boxes; (7) disenfranchising out-of-precinct voters; (8) targeting jurisdictions with large populations of Black voters

and other voters of color by stripping the Secretary of State of his vote on the State Election Board, replacing the Secretary of State with a voting member appointed by the General Assembly, and granting the State Election Board the power to effectively take over county boards; (9) encouraging the submission of "unlimited" numbers of voter challenges; (10) criminalizing the act of providing people waiting in line to vote with food and water; and (11) prohibiting the use of mobile voting units.

4.     These changes to Georgia voting laws are intended to suppress the vote of Black voters and other voters of color.  In the 2020 and 2021 elections, voters of color used methods such as absentee and Sunday voting in numbers not seen before.  In response, the Georgia General Assembly enacted SB 202 to target and limit the means of voting that have been increasingly used by Black voters and other voters of color.

5.     Many of these provisions will inevitably lengthen and compound the problem of long lines and delays at polling locations by making absentee mail voting and in-person early voting harder.  SB 202 then further burdens and discourages voters from waiting in these long lines to vote by criminalizing the simple act of providing water or snacks to voters while they wait in line.  Black voters and other voters of color are disproportionately impacted by long lines and

delays at the polls and stand to suffer most (and be disproportionately discouraged from voting) when charitable organizations can no longer provide even water or snacks to those waiting to vote.

6.      SB 202 also threatens the right of voters of color to participate equally in the political process by encroaching on and threatening to eviscerate the power of county election boards—the very boards responsible for protecting that right.

7.      The provisions of SB 202, viewed individually and collectively, threaten the fundamental right to vote of all Georgians, but their impact will be felt most intensely by persons of color, which is precisely what the legislature intended.

8.      This Court should declare SB 202 unlawful and unconstitutional, and permanently enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) and 52 U.S.C. § 10308(f) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the First, Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act of 1965 (52 U.S.C. § 10301), 42 U.S.C. § 1983, and the Civil

Rights Act of 1964.  This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

10.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and under Local Rule 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

## PARTIES

13.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941.  Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans.  It is headquartered in Atlanta and currently has approximately 10,000 members.

14.    The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote ("GOTV") efforts, election protection, and census participation.

15.    The Georgia NAACP has branches in counties across the state of Georgia that are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts, including Sunday early voting events, such as "Souls to the Polls."

16.    The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

17.    The Georgia NAACP engages in voter outreach efforts, including voter education on voting in-person during early voting, voting by mail and voting in person on election day.

18.    The Georgia NAACP has engaged in GOTV campaigns.  One of the key components of these campaigns is providing accurate information regarding mail-in ballots to the Georgia NAACP's membership and the rest of the public.

19.    The Georgia NAACP has developed materials and worked with local NAACP branches to educate its members and the public about voting by mail,

including providing information concerning the availability and location of mail ballot drop boxes during the 2020 general election and 2021 runoff election cycle. The Georgia NAACP also developed messaging and materials regarding mail ballot drop box locations in particular counties.

20.   The Georgia NAACP has conducted text and phone banking programs and reached out to voters throughout Georgia to encourage voter participation and to educate the public about the voting process, including about voting by mail.

21.   The Georgia NAACP has supported in-person voting by providing food and/or drinks to voters who request such while waiting in long lines to vote. This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks.  The Georgia NAACP members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally. They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

22.   Many of the Georgia NAACP's members have voted by mail in the past and stand to be negatively impacted by the substantial changes to Georgia's vote by mail procedures that have been enacted as part of SB 202.  Many more will

be impacted by the changes to the availability of absentee ballot drop boxes, changes to early voting times and days and the requirement of a sworn affidavit for voters who go to the wrong precinct to vote prior to 5 p.m., as set forth in SB 202. Many Georgia NAACP members are at risk of being disenfranchised by the changes in SB 202.

23.    The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

24.    Due to the substantial changes in absentee voting procedures, absentee ballot drop boxes, early voting periods, restrictions on out-of-precinct voting, criminalization of the expressive act of "line warming" activities such as supplying water and snacks to voters in line and the other changes caused by the enactment of SB 202, the Georgia NAACP will not only have to change its messaging to voters of color about these changes, but the Georgia NAACP will also have to divert considerable resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist eligible voters.

25.    The Georgia NAACP will also have to divert its resources to educate voters about the substantial changes to the mail voting process, and will have to respond to questions from voters who used a mail ballot drop box in the November

2020 election and will be confused by the fact that they are not available outside early voting locations in the future.

26.   The Georgia NAACP has traditionally provided transportation to the polls for voters on election day.  The Georgia NAACP will have to divert resources to physically transport voters to the county board of elections to drop off their mail ballots or to polling places or early voting locations to vote in person if they cannot vote by absentee ballot.  The nature and scope of the Georgia NAACP's voter assistance efforts will need to change if voters do not have access to a drop box or mail ballots are rejected due to the burdensome ID requirements and complicated changes for completing absentee ballot applications and returning absentee ballots.

27.   The Georgia NAACP's additional efforts to educate voters whose mail ballots are rejected due to the new ID requirements and other procedures will force the Georgia NAACP to have to divert substantial resources away from core activities such as voter registration and other efforts such as criminal justice work. This is due to the fact that the Georgia NAACP's resources are limited.

28.   Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia.  The GCPA is a coalition of more

than 30 organizations, which collectively have more than 5,000 individual members.

29.    In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

30.    During the 2020 elections and the January 5, 2021 runoff cycle, the GCPA's voter outreach efforts were conducted in the greater Metro Atlanta region as well as throughout other areas of Georgia from the aforementioned field offices and covered approximately 88 counties in the state.

31.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia.  The GCPA's support of voting rights is central to its mission.  The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, census participation and litigation.

32.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" GOTV events during Sunday early voting and other GOTV

efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of color.  The GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

33.    GCPA's voter education and empowerment programs have included, but were not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on election day and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

34.    The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to assist voters on the ground near polling sites.

35.    GCPA also participates in media interviews, sponsors Public Service Announcements (PSAs), places billboard ads, conducts phone banking, and

engages in text message campaigns to educate voters and to encourage participation.

36.    GCPA has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. GCPA members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

37.    The GCPA has an interest in preventing the disenfranchisement of eligible voters who now run the risk of becoming disenfranchised as a result of the new restrictions imposed by SB 202, including substantial and burdensome ID requirements for absentee by mail voting; limitations on early voting days and hours, including Sunday early voting; diminished availability of absentee ballot drop boxes except inside early voting locations during early voting hours, the lack of 24/7 hour access to absentee ballot drop boxes which renders them essentially useless to many voters; the criminalization of "line warming," activities, i.e., providing water and snacks to people in line to vote and other persons in the

vicinity of polling locations; and other unreasonably burdensome restrictions imposed by these new voting changes on voters and election officials alike.

38.    SB 202 will substantially and negatively impact the GCPA's advocacy efforts now and in the future.  This law will inevitably cause Black voters and other voters of color negatively impacted by these new restrictions to lose faith that their votes will be counted on an equal basis as white voters.  This sense of futility will likely depress turnout in the future and make it more difficult for the GCPA to carry out its mission of encouraging Black voters, other voters of color and voters in underserved communities to register to vote, vote, and to help protect the rights of other Georgians to vote.

39.    Due to the substantial changes in existing Georgia election law and procedures, including the potential imposition of new criminal penalties and significant fines and fees, SB 202 has caused, and will continue to cause, the GCPA to divert a portion of its financial and other organizational resources to educating voters about these changes and assisting voters facing these new restrictions and burdens.

40.    As a result of the enactment of these new restrictions on voting in Georgia, the GCPA has, and will continue to have, fewer resources to dedicate to its other organizational activities, including voter registration drives, GOTV efforts

and other projects, unless the Court enjoins implementation and enforcement of these new laws.

41.   Plaintiff LEAGUE OF WOMEN VOTERS OF GEORGIA, INC. ("League") is a nonpartisan political organization that has worked for the last 101 years to ensure that every person has the desire, the right, the knowledge and the confidence to participate in our democracy.  The League's 13 local organizations and nearly 700 members are dedicated to their mission of empowering voters and defending democracy.

42.   From the League's inception, members have worked for good government by studying issues, advocating for reforms, and, through the League's Observer Corps, observing and reporting on the work of all levels of government. The League is committed to registering voters, regardless of their political affiliation, and is particularly proud of its work, with community partners, in registering new American citizens at citizenship ceremonies.  The League is also dedicated to voter education, through both candidate forums and the Vote411.org voter guide.  Many League members also assist with GOTV efforts, poll watching, and serving as vote review panelists.

43.   As part of its mission, the League advocates for expansion of voting opportunities, including through absentee by mail voting, early in-person voting

and election day voting.  The League expends significant resources in furtherance of its mission, including by organizing voter registration drives, educating the public about the voting process, and assisting voters who have questions or need help navigating the voting process.  The League has seen a substantial increase in the number of its members and other individuals who turned out to vote by mail and during early in-person voting during the 2020 election cycle and January 5, 2021 Senate runoff elections.

44.    The League has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. The League members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

45.    As a result of the risk of disenfranchisement due to new ID requirements for absentee by mail voting, the League must divert more resources toward educating voters about these new requirements, including, but not limited to, warning them of the risk of disenfranchisement if they fail to provide the

required ID and other required information when applying or absentee ballots and when returning the ballots; answering questions from members of the public about these new voting restrictions; and explaining how they impact their right to vote.  The League will need to devote significant staff time and funds to update standard training materials and informational booklets to reflect these sweeping changes.

46.    The League must divert these resources away from its regular advocacy, voter registration, fundraising, and other activities, affecting its ability to operate and function with respect to its normal activities.

47.    Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC. ("GALEO LCDF"); is a non-partisan, nonprofit corporation.  GALEO LCDF is one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community.  GALEO LCDF has approximately 165 members across Georgia.

48.    GALEO LCDF's headquarters is located in Norcross, which is in Gwinnett County, and a substantial amount of GALEO LCDF's civic engagement, voter registration and GOTV work takes place in Gwinnett County and other Georgia counties.  This work includes organizing voter education, civic engagement, voter empowerment and GOTV events and conducting voter

registration drives.  After Gwinnett County became a covered jurisdiction for Spanish under Section 203 in December 2016, GALEO LCDF has worked also with the Gwinnett County Board of Registration and Elections in an effort to bring its procedures and election materials into compliance with the law's requirements.

49.    During the 2020 election cycle, GALEO LCDF also worked to address challenges facing Gwinnett County's Limited English Proficiency ("LEP") Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

50.    GALEO LCDF sent bilingual mailers to Latinx Gwinnett County voters with information about the presidential primary as well as additional mailers after the primary was postponed due to COVID-19.

51.    GALEO LCDF also sent several rounds of bilingual mailers to all Latinx Georgia voters for both the General Election and the January 5, 2021 runoffs.  GALEO LCDF also ran paid advertisements on Spanish media (radio & TV) to promote voting and educate voters about voting for both elections.

52.    Due to the sweeping changes to many facets of voting that stand to disenfranchise Latinx, language minority voters and voters of color, GALEO LCDF will be forced to divert resources from its voter registration, existing voter education programs, GOTV activities and other programs to assist voters, particularly LEP voters and new Americans, in being able to navigate the many

changes and challenges of SB 202 that will make it more burdensome for them to vote by absentee ballot, during early voting and in person on Election Day.

53.    Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia.  It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia.  Since its founding in 1970, COMMON CAUSE has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections.  COMMON CAUSE, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered and have their ballots counted as cast.

54.    In Georgia, COMMON CAUSE has increased its efforts in the areas of election protection, voter education, and grassroots mobilization around voting rights in the state.  COMMON CAUSE works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit.

55.    COMMON CAUSE, alongside other partners in Georgia, created a program to help recruit volunteers to monitor local board of elections meetings.

COMMON CAUSE also works with these partners in election protection efforts during both midterm and presidential elections.  Through its volunteer recruitment for poll monitors, COMMON CAUSE in Georgia monitors an average of five polling locations in 22 counties for a total of 110 polling places.  COMMON CAUSE in Georgia additionally engages in online petition drives, soliciting signatures from its members and supporters urging government officials to take certain actions.

56.     COMMON CAUSE in Georgia also works directly with voters who cast provisional ballots to help ensure their ballots can be counted.

57.     COMMON CAUSE has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks.  COMMON CAUSE members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

58.     During the 2020 election cycle, COMMON CAUSE in Georgia assisted some 6,000 voters who cast provisional ballots to cure those ballots so

they could be counted—most were cast because the voter appeared at the wrong precinct.  As a result of the enactment of SB 202, COMMON CAUSE will divert resources that it would have applied to other organizational and programmatic resources toward helping voters resolve provisional ballot issues, including provisional ballots cast due to voters appearing at the wrong precinct, often through no fault of their own.

59.    Plaintiff LOWER MUSKOGEE CREEK TRIBE is a state-recognized tribe located in Grady County on the southwest border of Georgia.  The tribal government is located in the old tribal town of Tama, which is located in Whigham, Georgia.  The tribe has an enrollment of approximately 2,700 members, most of whom live in rural southwest Georgia and northern Florida within a 150-mile radius to Whigham.  The tribe operates a civics education program for its members to encourage them to participate in the political process.  The tribe's members are disproportionately poor and likely to be affected by SB 202's cutback on voting by mail and criminalization of providing food and water to voters in line at the polls.

60.    The United States Census Bureau's 2019 Five-Year American Community Survey (ACS) estimates indicate that 41.6% of American Indians in Georgia do not have a computer at home and that American Indians in Georgia are

155% less likely than white Georgians to have a computer at home. This makes it more likely that Georgia's American Indian voters, including members of the LOWER MUSKOGEE CREEK TRIBE, will face significantly higher burdens complying with SB 202's absentee ballot provisions than white voters because they are less likely to have a computer, printer scanner or internet access at home. These resources are needed to obtain and print an absentee ballot application from the websites of the Secretary of State or county registrar and to print necessary ID documentation for the absentee ballot application and to include when returning a voted absentee ballot to their county registrar's office.

61.    Defendant BRAD RAFFENSPERGER is the Secretary of State of the State of Georgia and a non-voting *ex officio* member of the State Election Board. Pursuant to O.C.G.A. § 21-2-50, Secretary Raffensperger has broad authority as the state's chief election official in the administration and implementation of Georgia's election laws and regulations. These duties include, but are not limited to, training county registrars and superintendents; receiving, computing and certifying election returns; providing information to citizens regarding voter registration and voting; maintaining the state's active and inactive voter registration lists; certifying candidates as required by law; preparing and publishing all notices and advertisements as required by Georgia law regarding the

conducting of elections; providing blank election forms to superintendents as other supplies; creating and programming ballots; and other duties as required by law. Secretary Raffensperger is also responsible for coordinating Georgia's compliance with the National Voter Registration Act of 1993 (52 U.S.C. § 20507, *et seq*).  SB 202 specifically tasks the Secretary of State with numerous responsibilities, including responsibility for making available Georgia's absentee ballot application form, which requires the voter to provide their date of birth, a Georgia driver's license or identification card (or copies of other specified documents).  Secretary Raffensperger is sued in his official capacity.

62.   Defendants JOHN FERVIER, Chair, MATTHEW MASHBURN, SARA TINDALL GHAZAL, EDWARD LINDSEY, AND DR. JANICE W. JOHNSTON are voting members of the State Election Board and are named herein in their official capacities.

63.   The duties of members of the State Election Board include: promulgating rules and regulations to "obtain uniformity" in the practices and proceedings of elections officials, "as well as the legality and purity in all . . . elections"; "formulating, adopting, an orderly conduct of primaries and elections"; promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote";

and investigating frauds and irregularities in elections.  *See* <u>O.C.G.A. § 21-2-31.</u> <u>SB</u> 202 specifically tasks the State Election Board with numerous responsibilities, including enforcing compliance with the new voter challenge provisions.  SB 202, §§ 15 & 16.

64.     Defendant PATRISE PERKINS-HOOKER is the Chairwoman of the FULTON County Registration and Elections Board and is named herein in his official capacity.  Defendants AARON V. JOHNSON, MICHAEL HEEKIN, and TERESA F. CRAWFORD are members of the FULTON County Registration and Elections Board and are named herein in their official capacities.

65.     The FULTON County Registration and Elections Board is responsible for administering elections in Fulton County.  *See, e.g.*, <u>O.C.G.A § 21-2-40(b)</u> (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots). SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee

ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

66.     Defendant WANDY TAYLOR is the Chairwoman of the GWINNETT County Board of Registrations and Elections and is named herein in her official capacity.  Defendants ALICE O'LENICK, LORETTA MIRANDOLA, DAVID HANCOCK and ANTHONY RODRIQUEZ are Members of the GWINNETT County Board of Registrations and Elections and is named herein in their official capacities.

67.     The GWINNETT County Board of Registrations and Elections is responsible for administering elections in Gwinnett County.  *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots).  SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the

compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

68.    Defendant TORI SILAS is the Chairwoman of the COBB County Board of Elections and Registration and is named herein in his official capacity. Defendants JENNIFER MOSBACHER, DEBBIE FISHER, STACY EFRAT, and STEVEN F. BRUNING are Members of the COBB County Board of Elections and Registration and are named herein in their official capacities.

69.    The COBB County Board of Registrations and Elections is responsible for administering elections in Cobb County.  *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id*. § 21-2-70 (describing the powers and duties of superintendents); *id*. § 21-2-381 (describing duties in relation to absentee ballot applications); *id*. § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots).  SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution

periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

## STATEMENT OF FACTS

### Georgia's History of Racial Discrimination in Voting

70.    Georgia has a long history of racially discriminatory voting practices. As one federal judge has found:

> The history of the states [sic] of segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof.  Generally, Georgia has a history chocked full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.

*Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994).  *See also, e.g.*, *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

71.    As a result of this extensive and well-documented history of discrimination against racial minorities, Georgia was a "covered jurisdiction"

under Section 5 of the Voting Rights Act, which required Georgia to get approval by the federal government for any changes to its election practices or procedures. This approval process allowed the federal government to review the proposed change to determine that it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304.

72.    During the time that Section 5 of the Voting Rights Act applied, the federal government was required to intervene in Georgia's racially discriminatory voting practices 187 times.  And, as the U.S. Commission on Civil Rights, a bipartisan, independent agency found, among the states subject to preclearance under the Voting Rights Act, Georgia was the only state that had implemented voting restrictions in *every category* the Commission examined:  strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

73.    After the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), invalidated the coverage provision that subjected Georgia to the preclearance requirement of the Voting Rights Act, Georgia immediately began to

impose restrictions on voting rights designed to suppress Black votes and votes by other people of color.  Some examples of the many such restrictions are as follows.

74.   ***Exact Match Registration Requirements:***  Starting shortly before the 2008 election, the Georgia Secretary of State's office began implementing a policy where information on voter registration forms was compared to records on file with the Georgia Department of Drivers Services or Social Security Administration.  If the information did not match exactly—*e.g.*, if even a hyphen or apostrophe were different or an extra space was added—the registration was not accepted and the burden passed to the applicant to cure the "problem."  The U.S. Department of Justice objected to this "exact match" protocol, concluding that the "flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote."  In 2010, despite repeated warnings that the protocol would disproportionately burden eligible minority applicants, the Georgia Secretary of State's office implemented a revised version of the "exact match" system.  This revised system was codified into law by H.B. 268 and remained in effect until civil rights and other groups brought extensive litigation that largely ended the practice in 2019.

75.   ***Photo Identification Requirements and Barriers:***  In 2005, Georgia adopted a strict photo identification requirement for voting.  The 2005 photo ID law required individuals lacking photo ID to pay $20 for a photo ID card or to sign an affidavit declaring indigency.  Only after a federal court enjoined its original photo ID bill did the Georgia Legislature revise its photo ID law in 2006 to allow for more equal access to the necessary photo ID.

76.   While Georgia state law now allows for a "free" state-issued ID for those who do not have one, driver's license offices in Georgia's Black Belt—21 contiguous and predominantly Black rural counties—are open two days per week or fewer.  Additionally, studies show that the actual cost for "free IDs" typically ranges from $75 to $175 after factoring in documentation, travel and waiting time.

77.   **Voter Purges:**  Georgia aggressively purges registered voters from the voter rolls at a rate much higher than most other states.  For example, Georgia purged approximately 1.5 *million* voters between the 2012 and 2016 elections alone.  And in 2019 alone, more than 313 voters were removed on the grounds that they had moved—despite a subsequent analysis that showed that over 60% of the purged voters had not moved, and that the purges predominately impacted non-white voters in the Atlanta metropolitan region.  Voters are frequently removed

merely because they did not manage to vote in prior elections, and these purges

disproportionately affect Black voters and voters of color.

78.   ***Criminal Investigations:***  Georgia has launched numerous criminal

investigations against voting organizers, focusing on those who register Black

voters and other voters of color.  For example, in 2010, the Georgia Secretary of

State's office aggressively pursued an investigation of a dozen Black voting

organizers in Brooks County that led to a criminal prosecution.  The investigation

followed the election of the county's first ever majority-Black school board, which

was catalyzed by GOTV activists.  None of the organizers was convicted even

though they were initially charged with more than 100 election law violations

carrying penalties of more than 1,000 combined years in prison.  The Georgia

Attorney General subsequently issued an opinion saying that the organizers'

alleged crime—mailing absentee ballots by a third party—was permissible under

state law (although SB 202 now tries to criminalize similar actions).

79.   ***Closures and Relocations of Polling Places, and Long Lines to Vote:***

Counties throughout Georgia have aggressively closed and relocated polling

locations despite an overall increase in registered voters.  One study found that

10% of Georgia's polling locations have closed since 2013.  Such closures and

relocations have disproportionately occurred in communities of color.

80.     As a result in part of these closures, Black voters and other voters of color have been forced to wait in increasingly long lines in order to vote.  *See, e.g.*, Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For Hours? Too Few Polling Places*, Georgia Public Broadcasting, Oct. 17, 2020, *accessible at* https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl.  According to one study, Black voters are likely to wait 45% longer in line to vote than white voters, with Black Georgians waiting an average of nearly one hour to vote while white voters wait only six minutes.  In 2020, Black voters in Fulton County waited over five hours to vote in primary elections, and some Fulton County voters waited more than ten hours to cast a ballot during early voting for the general election. Numerous studies have consistently shown that long lines deter people from voting.

81.     SB 202 is the most recent incarnation of this long history of discriminatory voting practices in Georgia.

**Racial and Ethnic Demographics of Voting in Georgia**

82.     The Secretary of State of Georgia maintains detailed records as to the racial demographics of voting.  As a result, the Georgia legislature and its elected

officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

83.   In every presidential election since 2004, the share of registered voters who are white has decreased in Georgia:  from 68% in 2004, to 63% in 2008, to 59% in 2012, to 56% in 2016, to 53% in 2020.  During that same period, the cumulative share of registered Black, Latinx and Asian American/Pacific Islander ("AAPI") voters and voters who are members of indigenous tribes has increased.

84.   The percentage of the vote that the Republican Presidential candidate has received in Georgia has decreased in every election since 2004 with the exception of 2012.

85.   The 2018 statewide election in Georgia demonstrated how fragile the Republican Party's hold on the state was.  While Republican candidates won the races for Governor, Lieutenant Governor, Secretary of State, and Attorney General, all of the winners received less than 52% of the vote and the Secretary of State election went to a run-off.

86.   In 2020, a Democratic candidate won the presidential election for the first time in Georgia since 1992, and two senatorial races were sent to run-offs, with both Democratic candidates winning in January 2021.  This was the first time a Democrat had won a United States Senate race in Georgia since 1996.

87.     Between 2016 and 2020, the share of registered voters who are white decreased from 56% to 53% and the percentage of voters who turned out who were white decreased from 61% to 58%.  These percentages stayed the same for the January 2021 run-off elections.  These 3 percentage point drops were determinative in who won the 2020 and 2021 elections.

88.     Election analysis demonstrates that Black voters and other voters of color usually provide strong support to Democratic candidates.  Members of the Georgia General Assembly are aware of this fact.

89.     As seen in the following graphs, even before the pandemic, Black, Latinx, AAPI and American Indian Alaska Native voters (referred to as "AIAN") in Georgia had made increasing use of voting by mail and early voting.  This trend increased significantly during the 2020 and 2021 elections because of the pandemic.











90.    Between the 2016 and 2018 general elections in Georgia, the percentage of Black, Latinx, AAPI and indigenous tribe voters choosing to vote by mail increased, while the percentage of White voters choosing to vote by mail decreased somewhat.  White, Black, Latinx, AAPI, and indigenous voters all chose to vote by mail at larger percentages during the 2020 and 2021 elections because of the pandemic, with a greater percentage of Black and Asian voters choosing to vote by mail than White voters.

91.   Mail ballots of voters of color are substantially more likely to be rejected than mail ballots by white voters.  According to one study, in Georgia's June 2020 primary, 0.9% of mail ballots cast by white voters were rejected, but mail ballots cast by Black, Latinx, and AAPI voters were rejected at a rate of 1.6%, 1.9%, and 2.4%, respectively.

92.   The significant use of early voting opportunities by persons of color in Georgia, and particularly Black voters, is due in substantial part to in-person early voting on Sunday where, because of "Souls to the Polls" programs, Black voters, who in the 2020 general election comprised approximately 30% of all registered voters in Georgia, accounted for 36.5% of early in-person Sunday voters, compared to 26.8% of early in-person voters on other days.  In comparison, 60% of voters who voted early on days other than Sunday were white; but whites comprised only 47% of in-person early voters on Sundays, despite comprising 53% of Georgia's registered voters.

93.   Black residents of Georgia are 88% more likely than white Georgians to be below the poverty level and 58% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter

technology access issues that would render the printing and copying requirements of SB 202 more burdensome on them.

94.   Latinx residents of Georgia are 91% more likely than white Georgia residents to be below the poverty level and 74% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter technology access issues that would make the printing and copying requirements of SB 202 more burdensome.

95.   Native Hawaiian Pacific Islanders are 100% more likely than white Georgians to lack computer access in their homes.

96.   Upon information and belief, Black and Latinx voters and other persons of color in Georgia are more likely than white voters in Georgia to hold jobs that do not give them the flexibility to take off from work during the time that early voting and drop boxes are available under the new restrictions of SB 202.

97.   Black and Latinx households in Georgia are substantially less likely than white households to own a vehicle, and Black and Latinx residents are more likely to have to use public transportation than white residents.  Upon information and belief, this means that Black and Latinx Georgia voters rely more heavily than white voters on easily accessible polling places.

98.   Since 2013, Georgia has experienced polling place closures, consolidations, and changing of locations of polling places, often in communities of persons of color.

99.   Persons of color are more likely than white voters to confront long lines to vote in Georgia when they vote in person.  Long lines are well-known to depress voter turnout.

100.  Voting in Georgia is highly racially polarized, with Black voters and other voters of color voting for Democratic candidates at far greater rates than white voters.

### The 2020 and 2021 Elections

101.  In 2020, Georgians voted for President, two U.S. Senators, and numerous other federal and state positions.  After none of the U.S. Senate candidates received the more than 50% vote necessary to avoid a runoff, Senate runoff elections were held in January 2021.

102.  The 2020 and 2021 elections saw record turnout among Georgia voters, as well as unprecedented enthusiasm for absentee, early, and drop box voting.

103.  To the apparent horror of politicians who had long sought to suppress Black and minority voters, this surge in voting was most pronounced in these exact

communities.  For example, there was a 25% increase in Black voter registration compared to 2016, and Black voters—who historically turned out for runoff elections at much lower rates than general elections—returned to vote in the runoff elections at a higher rate than white voters.

104.  Many of these Black and other minority votes came in the form of absentee and early voting.  In fact, nearly 30% of Black voters cast their ballot by mail, with Black voters accounting for almost 32% of absentee ballot requests.  In contrast, only roughly 24% of white voters voted through the mail.  Although white voters still made up a majority of mail voters in the 2020 general election, their share of the vote-by-mail electorate dropped from 67% in 2016 to 54% in 2020; the Black share, meanwhile, surged from 23% to 31%.

105.  Ultimately, the 2020 and 2021 elections resulted in, among other things, the election of the President preferred by Black Georgians, as well as the election of the first Black person to represent Georgia in the United States Senate, Reverend Raphael Warnock.

106.  Following these results there was a widespread effort to attack the integrity of Georgia's elections, including by repeated, baseless allegations of fraud and falsely casting doubts as to the integrity of mail-in votes and those that were received in drop boxes.  Many of these groundless allegations came from

former President Trump and his supporters, in an effort to overturn the results of

the election.  However, while numerous plaintiffs brought litigation echoing these

allegations, the results of this litigation consistently demonstrated that mail-in and

drop box voting were safe and secure.  In fact, Secretary Raffensperger's office

conducted a thorough investigation and audit into these claims of wrongdoing,

ultimately finding no evidence to support the allegations.  As Secretary

Raffensperger explained to the U.S. Congress, "there is nowhere close to sufficient

evidence to put in doubt the result of the presidential contest in Georgia," and his

office did not "see[] anything out of the ordinary scope of regular post-election

issues."

### The Legislative History of SB 202

107.  In response to the record participation in the 2020 and 2021

elections—and, in particular, the record participation of Black voters and other

voters of color—Republican legislators introduced a wave of proposed legislation

in 2021, including SB 202.  This proposed legislation was grounded in baseless

and often racially tinged claims of voter fraud and election irregularities.  Eleven

such bills were proposed in Georgia itself.

108.  The procedure leading up to the passage of SB 202 was rushed and

irregular.  Bills covering the same subjects, but with slightly conflicting provisions

were introduced in both houses of the Georgia legislature, sometimes in the same house.  Committee hearings were scheduled on the bills, but without posted agendas, and without ample notice to the public or opportunity for the public to view the proceedings without attending them in person.

109.  Throughout the hearings held on these bills, the legislators were repeatedly warned by community members and organizations that these bills, including SB 202 and predecessor bills with similar provisions, would adversely and disproportionately impact populations of persons of color.

110.  For example, at a February 19, 2021 hearing on a related bill that contained many of the same provisions that ultimately were incorporated into SB 202, representatives of the Georgia Coalition for the People's Agenda noted that "prohibiting of early voting on Sundays, and therefore the elimination of the Souls to Polls, feels like a direct attack on certain communities."

111.  At this same hearing, representatives from the Southern Poverty Law Center Action Fund warned legislators that these bills represented calculated attempts to adversely impact minority groups, and that provisions such as the photo ID requirement for absentee ballots would disproportionately impact racial minorities.

112.  There was a brief hearing on SB 202 during the first week of March, 2021 before the Senate Ethics Committee.  At this time, SB 202 was a scant two-pages long, and limited to the issue of distribution of absentee ballot applications. At that hearing, representatives of community groups alerted the Committee to the potential negative impact on such community groups of the civil penalties for distributing absentee ballot applications to certain voters.

113.  On March 17, 2021, at a hearing of the House Special Committee on Election Integrity, SB 202 was discussed, despite no agenda for the hearing being provided to the public until two hours before the hearing.

114.  At this March 17, 2021 hearing, community organizations and civil rights organizations, including from the Georgia Coalition for the People's Agenda, expressed multiple concerns to lawmakers about SB 202, including the lack of transparency and irregular process, as well as concerns about the bill taking local authority away from county election officials.

115.  On March 18, 2021—the very next day—SB 202 was amended, with a new substitute replacing it.  Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, conducted a hearing of the House Special Committee on Election Integrity, despite not having a substitute bill ready to distribute, and instead described the changes to the bill without releasing new

48

language to the public.  Despite the fact that there were changes from the prior day, Chairman Fleming also prohibited comment from organizations that had provided comments on March 17, 2021.

116.  On March 19, 2021, two further substitutions to the bill were made and released to the public.

117.  On March 22, 2021, an hour before a scheduled hearing of the House Special Committee on Election Integrity on that same day, House leadership shared the new 90-plus page version of SB 202 with Democratic members of the Committee.  Chairman Fleming refused to take additional comment on the bill, despite the substantial changes and the two additional March 19 substitutions.

118.  To recap the amendments:  when SB 202 was first passed over from the Senate to the House on March 9, 2021, it was a 2-page bill that dealt only with restrictions concerning individuals and third-party groups sending absentee ballot applications to prospective voters.  In a matter of two weeks, the bill had grown to over 90 pages covering a host of additional topics.

119.  During the debates on the House and Senate floors on SB 202, Black legislators alerted their colleagues to the discriminatory impact SB 202 would have on Black voters and other voters of color.

120.  The bill was put up for a full vote on March 25, 2021.

121. Despite the requirements of Georgia law that bills having either a significant impact on expenditures of a state agency or at least a $5 million cost to local agencies must have a fiscal note attached, SB 202 contains no fiscal note. The failure to attach a fiscal note to the bill was raised on the Senate floor, but was summarily rejected by the President of the Senate.

122. Throughout the debate on SB 202, its supporters used the pretextual— and self-created—disproven myth of voter fraud and non-existent election irregularities in the 2020 Georgia general election to attempt to justify their actions. For example, Chairman Fleming of the House Special Committee on Election Integrity publicly likened absentee ballots to the "shady part of town down near the docks" where the "chance of being shanghaied" is significant.

**The Challenged Provisions of SB 202**

123. The final version of SB 202 is a 98-page omnibus bill which constitutes a major overhaul of Georgia's Election Code and voting procedures. These changes are summarized below.

124. ***New Burdens on Requesting and Casting an Absentee Ballot (Sections 25, 27, and 28):*** Georgia voters have cast absentee ballots by mail for decades. Voting by mail provides significant benefits to voters, including those who work multiple jobs, are unable to get time off or arrange child care to vote, or

have difficulties arranging transit to polling places.  It also can alleviate some of the barriers to voting such as those caused by long lines at the polls and confusing changes to voting locations.  SB 202 adds a new and complicated absentee ballot application process, as well as burdensome new mandatory ID requirements when requesting and casting an absentee ballot.

125.  Under these new requirements, voters must include a Georgia driver's license number or Georgia State ID number on their absentee ballot application.  If they have neither, voters are required to provide a copy of a current utility bill, bank statement, government check, paycheck or other government document that shows the name and address of the voter.  These documents, along with other required identifying information, must be attached to their absentee ballot applications.

126.  Likewise, in order to actually cast an absentee ballot, a voter must now provide additional personal ID information on the absentee ballot mailing envelope.  This information includes their Georgia driver's license number or Georgia State ID number.  If the voter does not have a Georgia driver's license or Georgia State ID, they must provide the last four digits of their social security number or a copy of a current utility bill, bank statement, government check,

paycheck or other government document that shows the name and address of the voter.

127.  SB 202 also mandates voters provide their date of birth on absentee ballot applications and absentee ballot return envelopes, even though the date of birth of a voter is not "material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018).

128.  Nevertheless, SB 202 mandates penalizing voters who fail to include this immaterial information on their absentee ballot applications or when returning their voted ballot to the county registrars, leading to the disenfranchisement of voters who fail to cure this omission.  This disenfranchisement violates 52 U.S.C. § 10101(a)(2)(B), which prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

129.  Because voters, except those over the age of 65 or disabled, must make a new application for an absentee ballot for each election in an election cycle, voters are now required to provide this ID and date of birth information multiple times each and every election cycle.

130.  These provisions will disproportionately affect voters from minority communities, who are less likely to possess a current and valid form of government issued photo ID and who have less access to state offices that issue such IDs.  Compounding these issues, voters from minority communities are also less likely to have access to computers and internet in order to print out proof of identification.  These increased burdens will lead to a further increase in the rate at which the ballots of Black and other voters of color are rejected.  Moreover, these requirements expose absentee ballot applicants to potential fraud or identity theft.

131.  ***Prohibitions on the Proactive Mailing of Ballot Applications (Section 25):***  As discussed above, voters must file complicated and burdensome applications for every single election in order to receive an absentee ballot.  During the 2020 and 2021 elections, election officials in Fulton and DeKalb Counties sought to lessen some of these burdens by mailing absentee ballot applications to all eligible voters within county lines.  This proactive mailing of absentee ballot applications allowed voters, and particularly Black voters and other voters of color, better access to the voting process.  Likewise, private individuals and groups, such as the Plaintiffs, also assisted voters in obtaining absentee ballot applications.

132. Now, SB 202 further compounds the burden on voting by prohibiting public employees and agencies from sending unsolicited absentee ballot

applications to voters.  Instead, voters must now specifically request an absentee

ballot application through the website of the Secretary of State, election

superintendent, or registrar.

133.  To further compound the issue, SB 202 also threatens private

individuals and non-public entities, such as the Plaintiffs, with a substantial risk of

incurring hefty criminal sanctions if they attempt to help voters request absentee

ballots.  If a person or entity sends an absentee ballot application to someone who

has already requested an absentee ballot or voted absentee, they can be fined—

despite the fact that many voters reported not receiving their absentee ballots after

making an initial request for one in the 2020 election cycle.

134.  SB 202 also creates additional, unreasonable burdens on organizations

and individuals who provide assistance to voters who wish to vote by absentee

ballots, including by: (1) prohibiting them from pre-filling the voter's information

on an absentee ballot application, even if the voter provides that information to the

person or organization sending the application; (2) prohibiting them from viewing

or handling completed absentee ballot applications, including by assisting a voter

to print, copy or fax a completed application in order to send the completed

application form to election officials; and (3) requiring individuals or organizations

to use the official absentee ballot application produced by the Secretary of State's

office when sending the application to voters, but compelling them to include a confusing disclosure on the form stating that the form was not sent by a government entity.

135.  These burdensome and baseless restrictions will disproportionately impact Black voters and other voters of color.  These voters are more likely to seek to vote by mail—and are more likely to face disparate burdens if they are forced to vote in person—but face heightened challenges accessing computers, the internet, and other resources that will now be necessary to successfully request, complete, and return absentee ballot applications.

136.  ***Delaying and Compressing Time Periods (Sections 27 and 28):***  SB 202 also delays and compresses multiple time periods related to voting that will disproportionately impact Black voters and other voters of color.

137.  *First*, while a voter could previously request an absentee ballot 180 days prior to the election in question, SB 202 limits the earliest that a voter can now request an absentee ballot to 78 days prior to the election.  Likewise, while the board of registrars was previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to many elections, SB 202 delays the issuance of absentee ballots to 25 to 29 days prior to a qualifying election.  And voters now must submit this absentee ballot request no later than 11 days prior to

the date of the election (instead of the previous deadline of the Friday immediately prior to an election).

138. *Second*, SB 202 shortens the runoff period to four weeks following the election that led to the runoff for stateside voters. This change significantly limits the ability of Georgians to register to vote or update their voter registration information before a runoff election and also significantly limits access to in-person early voting for runoff elections. For example, voters may only have a three-day early voting period if a runoff occurs during Thanksgiving week following a November general election. The ability to apply for and cast an absentee mail-in ballot during this reduced time period will also be challenging, if not impossible, for some voters—particularly lower income or hourly wage Black voters and other voters of color who are less able to take time off during their workday.

139. *Third*, SB 202 gives unlimited discretion to election boards to limit early voting hours to 9 a.m. to 5 p.m., and to two Saturdays before the election. And even if election boards want to expand those hours, they are prohibited from opening early voting before 7 a.m. or after 7 p.m., or for more than two Sundays. County boards of election are given unfettered discretion with no guidelines in determining whether to eliminate all Sunday early voting days.

140. The compressed periods for requesting and submitting an absentee ballot will leave voters who become ill or have to travel out of the area in the lurch if they cannot vote during early voting and are unable to meet the earlier deadline to apply for a ballot. It will disproportionately affect Georgian Black voters, who vote absentee at a higher rate than white voters, face longer lines and higher burdens if they are forced to vote in person, and have increased difficulty obtaining the necessary documentation and overcoming the other barriers to apply for an absentee ballot. And, as Black and other minority voters' mail-in ballots are rejected at significantly higher rates than those of white voters, this shortened period to cure ballot issues will likewise disproportionately impact Black and other minority voters.

141. The limitations on early voting hours similarly disproportionately affect Black and other minority voters. These voters are more likely to have inflexible work, school, child care, or similar obligations that prevent them from voting between 9 a.m. and 5 p.m. Likewise, Georgia Secretary of State statistics demonstrate that Black voters and other voters of color utilize Sunday early voting hours significantly more than white voters. Black voters and other voters of color take part in GOTV efforts focused on Sunday early voting, including "Souls to the Polls" events hosted by Black churches and other faith-based organizations that

provide rides to the polls following church services or as part of their church fellowship activities.  As a result, the elimination or reduction of Sunday early voting under SB 202 discriminates against Black voters and other voters of color who utilize Sunday early voting hours at higher rates than white voters.  In contrast, while SB 202 adds a second required Saturday of early voting, most of the large, metropolitan counties that contain significant Black and other minority voters already offered multiple weekend days of early voting.  The counties that did not, and that therefore will increase voting access, are largely rural, predominately white counties.

142.  The provisions of SB 202 imposing new burdens on voting by absentee ballots and limiting access to early voting also will result in longer lines and delays at the polls on election day, particularly for Black voters and voters of color in Georgia who are more often than white voters impacted by lines and delays when voting on election day.

143.  ***Drop Box Limitations (Section 26):***  During the 2020 election, there were 330 drop boxes in Georgia—including 94 across the core Atlanta counties of Fulton, Cobb, DeKalb, and Gwinnett—where voters could securely vote.  These drop boxes were heavily used by Black and other minority voters; for example,

counties containing large Black populations averaged significantly more drop boxes than those with majority-white populations.

144.  Many of these drop boxes were outside of buildings, and county election administrators had discretion to keep drop boxes open after business hours and up until the polls closed.  These drop boxes were monitored via video surveillance to ensure that they were secure and safe.  The accessibility of these drop boxes provided meaningful voting access to voters who otherwise would have been deterred by long lines (which are particularly prevalent in majority Black and Brown precincts), prevented from accessing polling places while open due to work or other restrictions, or subject to other impediments.  As a result, in part, of the availability of these drop boxes, the rate of absentee ballots rejected for lateness decreased significantly.  The drop boxes were safe and effective, and there is no evidence that they were susceptible to voter fraud.

145.  SB 202 significantly limits the availability and accessibility of absentee ballot drop boxes in several ways.  Each of these new restrictions on the availability of drop boxes will disproportionately impact Black voters and other voters of color, as well as senior and physically disabled voters, who used absentee ballot drop boxes in large numbers to avoid having to wait in long lines and face unreasonable delays during in-person early voting and election day voting.

146.  *First*, while all counties would be required to have at least one drop box, the number of drop boxes per county would be limited to the lesser of one per every 100,000 "active registered voters" or one per advance voting location in the county.  This restriction will disproportionately and discriminatorily impact Black voters and other voters of color.  For example, the four core Atlanta counties, which contain a large percentage of the total Black population in Georgia, will go from 94 drop boxes in 2020 to no more than roughly 23 drop boxes in future elections.

147.  *Second*, SB 202 limits the placement of drop boxes to the interior of early voting locations and prohibits access to drop boxes outside of the hours that early voting is taking place.  SB 202 likewise limits the hours during which early voting can take place (and thus drop boxes can be open).  These limitations effectively render drop boxes useless to anyone other than voters who could already participate in early voting and eliminate virtually all benefits of drop boxes *vis a vis* normal early voting.  As Black voters are more likely to work multiple jobs or jobs with inflexible hours, they gained the most benefit from the previous flexibility of drop box hours and locations, and therefore will be disproportionately burdened by these restrictions.

148.  *Third*, SB 202 requires that drop boxes be under constant surveillance by an election official, licensed security guard, or law enforcement official.  This requirement presents serious concerns regarding voter intimidation for voters of color, who are frequently and unfairly the targets of law enforcement.

149.  ***Disenfranchisement of Out-of-Precinct Voters (Sections 34 & 35):*** Over the last decade, Georgia shuttered hundreds of voting precincts, many in predominantly Black or other minority neighborhoods.  These closures, as well as numerous other changes to voting locales, have confused voters and caused many to attempt to vote at the wrong precinct.  Prior to the enactment of SB 202, a voter who attempted to vote at the incorrect precinct within the same county where they were registered to vote could cast a provisional ballot, which would be counted for every race on that ballot in which the voter was qualified to vote.  SB 202 essentially disenfranchises these voters.

150.  Under SB 202, only voters who arrive to vote after 5 p.m. and sign an affidavit under penalty of perjury that they cannot get to their home precinct before the close of the polls will be able to cast a provisional ballot which will count with respect to the same contests on the voter's home precinct ballot.  All other voters who arrive at the incorrect precinct before 5 p.m. can cast a provisional ballot at the incorrect precinct, but none of their votes will count.  In order for their votes to

count, they will be required to vote at their home precinct, even if they cannot get to their home precinct by the time polls close.  The Board of Elections is tasked with reviewing the sworn statements submitted by the voters who cast provisional out-of-precinct ballots after 5 p.m., but it is unclear what the purpose of that review would be.

151.  Upon information and belief, the out-of-precinct voting prohibitions of SB 202 are more likely to disproportionately and negatively impact Black voters and other voters of color who are more frequently impacted by polling place closures and consolidations in majority-minority precincts than white voters in majority-white precincts, which often leads to voters being confused about the location of their correct precinct on election day.

152.  ***Punishments for Officials Who Defend Voters' Rights (Sections 5, 6, and 7):***  Apparently in retaliation for Secretary Raffensperger's defense of the integrity of the Georgia election system, SB 202 removes election-related powers from the Secretary of State.  The Secretary of State will no longer serve as the Chair or have a vote as a member of the State Election Board.

153.  Another provision of SB 202 allows the State Election Board and members of the General Assembly to take over county election offices.  Similarly, the county commissioner or members of the General Assembly could take action to

commence a performance review of election supervisors that could lead to their suspension. Up to four election supervisors could be suspended at one time. It is foreseeable that the takeover provision of SB 202 will disproportionately and negatively impact Black voters and other voters of color residing in counties with large percentages of minority voters, such as Fulton, DeKalb, Gwinnett, Clayton, Chatham, and others where the Republican members of the legislature fear the erosion of the tenuous hold on their majority party status and may use this procedure to challenge and reject legitimate ballots and disqualify eligible voters.

154. ***Unlimited Challenges to Voters (Sections 15 and 16):*** SB 202 also encourages large-scale voter challenges and purges—including on the eve of elections when county registrars are otherwise focused on administering early voting and preparing for election day—by allowing for unlimited numbers of challenges to be made to the eligibility of voters by other registered electors in a county and mandating that county registrars conduct hearings on such challenges within ten days of receipt and allowing for the immediate removal of voters from the statewide voter registration list.

155. SB 202 also provides that challenged voters be given only three days' written notice by mail of the hearings on the challenges, thereby making it difficult, if not impossible, for lower income and hourly wage Black voters, other

voters of color, senior voters, physically disabled voters and other voters who have other obligations during the hearing days and times to attend these hastily arranged hearings.  The minimal notice provisions authorized by SB 202, combined with the burden presented of unlimited challenges, also makes it unlikely that voters will actually receive the written notice prior to the hearing or be able to prepare adequately to rebut unfounded challenges and increases the likelihood that eligible voters will be disenfranchised on the eve of elections.

156.  ***Criminalization of Line Warming (Section 33):***  SB 202 also criminalizes "line warming," the expression of well-meaning individuals and organizations to support and encourage the act of voting in a non-partisan way by handing out water or snacks to ease the burden on voters standing in line for protracted periods to vote.  SB 202 bars such assistance within 25 feet of any voter standing in line to vote at any polling place, thereby restricting line warming expression for hundreds of feet outside of the entrances to polling places.

157.  These line warming restrictions will disproportionately affect Black and Brown voters, who are more likely to experience long lines and delays at the polls.  These provisions also subject individuals and organizations to criminal sanctions for engaging in the Constitutionally protected expressive conduct of distributing food and beverages to voters in line.

158.  ***Ban on Mobile Voting Facilities (Sections 20 & 26):***  Prior to SB 202, Georgia county election administrators were permitted to provide "mobile voting units," or movable or portable polling facilities used as supplemental polling locations both during early voting and on election day.  In 2020, two such mobile voting units were used in Fulton County, which is more than 44% Black and which has a history of long lines to vote and difficulties in obtaining an absentee ballot.  These two mobile voting units allowed more than 11,200 people to vote.  There is no evidence that the mobile voting units used in the 2020 election posed election security risks or created any additional administrative issues.

159.  SB 202 effectively bars such mobile voting units.  This prohibition was unmistakably intended to target the large Black population of Fulton County, and its enforcement will disproportionately harm Black and Brown voters.

## CLAIMS FOR RELIEF

## COUNT I

### 42 U.S.C. § 1983 and 52 U.S.C. § 10301
**(Discriminatory Purpose in Violation of the**
**Fourteenth and Fifteenth Amendments to the United States Constitution and**
**Section 2 of the Voting Rights Act, Against all Defendants)**

160.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

161.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right

secured by the Constitution or the laws of the United States caused by a person

acting under the color of state law.

162.  Both the Fourteenth and Fifteenth Amendments to the United States

Constitution prohibit intentional racial discrimination by state actors.

163.  Specifically, Section 1 of the Fourteenth Amendment provides that:

> No state shall make or enforce any law which shall abridge
> the privileges or immunities of citizens of the United
> States; nor shall any state deprive any person of life,
> liberty, or property, without due process of law; nor deny
> to any person within its jurisdiction the equal protection of
> the laws.

164.  Section 1 of the Fifteenth Amendment provides that:

> The right of citizens of the United States to vote shall not
> be denied or abridged by the United States or by any State
> on account of race, color, or previous condition of
> servitude.

165.  Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in

relevant part, provides:

> (a) No voting qualification or prerequisite to voting or
> standard, practice, or procedure shall be imposed or
> applied by any State or political subdivision in a manner
> which results in a denial or abridgment of the right of any
> citizen of the United State to vote on account of race or
> color, or [membership in a language minority group].

66

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

166. A violation of Section 2 of the Voting Rights Act may be based either on a finding of a discriminatory purpose behind the challenged governmental action or a finding of a discriminatory result from the challenged governmental action.

167. SB 202 was enacted with a racially discriminatory purpose in violation of Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments.

168. Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

169. The burdens of SB 202 are intended to, and will have, the effect of disproportionately and adversely affecting the right to vote of Black voters and other voters of color, including, but not limited to:

1)     Imposing onerous and unnecessary ID requirements on voters who
       submit applications for absentee ballots and when they return voted
       absentee ballots;

2)     Prohibiting public employees and public entities from sending out
       unsolicited absentee ballot applications to voters;

3)     Threatening private individuals and non-public entities with
       potentially large fines for sending absentee ballot applications with
       voter information filled in, without confusing and misleading
       statements, or to voters who are not currently registered to vote or
       who have already requested a ballot, received a ballot or voted a
       ballot;

4)     Delaying and compressing the time during which a voter can request
       or submit an absentee ballot;

5)     Giving county registrars unfettered discretion to limit early voting
       hours to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early
       voting;

6)     Limiting the number of absentee ballot drop boxes and limiting access
       to absentee ballot drop boxes to locations inside early voting sites
       when advance in-person voting is taking place, rendering the drop

boxes virtually useless since voters can vote early in person at these
locations;

7)   Prohibiting out of precinct voting before 5 p.m. without recognizing
the confusion and negative impact experienced by Black voters and
other voters of color from hundreds of polling place changes in
Georgia since the Supreme Court's decision in *Shelby County v.
Holder*;

8)   Removing the voting power of the Secretary of State on the State
Elections Board, coupled with granting power to the State Election
Board to take over county election boards and targeting jurisdictions
with large populations of Black voters and other voters of color;

9)   Encouraging the submission of large numbers of voter challenges by
using the term, "unlimited," in referring to elector challenges in
SB 202, and requiring the setting of hearings on the challenges within
ten days of their submission, with only three days mandatory written
notice of the challenge hearings to voters—making it difficult, if not
impossible, for voters to adequately prepare for the challenge
hearings—assuming voters even receive the written notice within
three days of the mailing of the hearing notices;

10)     Criminalizing "line warming," which provides relief for voters forced to wait in long lines because of the other discriminatory voting changes imposed by SB 202; and

11)     Prohibiting the use of mobile voting units.

170.  Race was a motivating factor behind the enactment of SB 202.

171.  SB 202 was enacted at a time when Black voters and other voters of color were making increasing use of means of voting that are being limited and restricted in SB 2020.

172.  SB 202 was enacted immediately following elections in which the size of the population of Black voters and other voters of color, particularly when compared to the diminishing share of the white vote, had become larger in statewide elections.

173.  In passing SB 202, the Georgia legislature deviated from procedural norms in its rushing the bill to passage, in its failure to provide adequate notice and opportunity to be heard and to view committee proceedings; in its speedy replacement of a 2-page bill with a 95-page bill without sufficient notice; and in its failure to include the required fiscal statement.

174.  The purported justification for SB 202 was pretextual.

175.  The Chair of the House Committee on Public Integrity made culturally insensitive statements in connection with the passage of SB 202.

176.  The supporters of SB 202 were on notice of the foreseeability of the disparate impact of SB 202.

177.  There are less discriminatory alternatives to every aspect of SB 202, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

178.  Defendants will be unable to prove that, SB 202 would have been enacted without race as a motivating factor.

179.  Implementation of SB 202 will irreparably harm Plaintiffs as well as Black voters and other voters of color by denying or abridging their right to vote.

180.  WHEREFORE, Plaintiffs pray for relief as set forth hereafter.

## COUNT II

**(Violation of Section 2 of the Voting Rights Act of 1965
52 U.S.C. § 10301, *et seq*., and 42 U.S.C. § 1983)**

181.  Plaintiffs repeat and re-allege and incorporate by reference all prior paragraphs as if fully set forth herein.

182.  Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

183.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States, in this case Section 2, by a person acting under the color of state law.

184.  In determining whether a challenged voting practice violates the results prong of Section 2 of the Voting Rights Act, courts examine the "totality of the circumstances" and determine whether "the political processes … are [] equally open to participation by [members of a protected class] … in that its members have less opportunity than other members of the electorate to participate in the political process."  *See e.g.*, *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1228 n.26 (11th Cir. 2005); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-98 (11th Cir. 1999).

185.  The challenged provisions of SB 202 violate the rights of Plaintiffs because they were adopted for the purpose of denying voters of color full and equal access to the political process.

186.  The disproportionate impact of these provisions, individually and collectively, is caused by present and past discrimination on account of race and ethnicity by the state of Georgia, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986).

187.  Georgia has a long history of official discrimination in the jurisdiction that touched the right of minorities to register, vote, or otherwise participate in the electoral process, and the history of voting discrimination against Black residents in Georgia is well documented.  Georgia's history of racial discrimination in voting is so long and deep that courts have taken judicial notice of it.  *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F.Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020).

188.  Voters of color in Georgia bear the effects of discrimination in education, employment, and health that hinder their ability to participate effectively in the political process.

189.  The policy behind the use of the voting practices in question is tenuous and pretextual.

190.  As a result of SB 202's requirements and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Georgia is not equally open to participation to Black voters and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

191.  The requirements and prohibitions of SB 202 described above constitute qualifications or prerequisites to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of U.S. citizens who are residents of Georgia on account of their race or color, or membership in a language minority group, in violation of Section 2 of the Voting Rights Act.

192.  Implementation of SB 202 will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### COUNT III

### 42 U.S.C. § 1983
### (Burden On The Fundamental Right To Vote
### First And Fourteenth Amendments)

193.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

194.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

195.  The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right.  The First

Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.

196.  The following provisions of SB 202—related to voter challenges (*see* Sections 15 and 16), requiring identification for the return of absentee ballot applications and voted absentee ballots (*see* Sections 25, 27, and 28), placing limitations on the use of drop boxes (*see* Section 26), compressing the timeframe for runoff periods to four weeks (*see* Sections 27 and 28), and delaying the issuance of absentee ballots to 25 to 29 days prior to a qualifying election (*see* Sections 27 and 28) —violate the First and Fourteenth Amendments' protection of rights to vote, thus giving Plaintiffs an actionable claim for the deprivation of those rights under 42 U.S.C. § 1983.

197.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment.  *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

198.  "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the

precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'"  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

199.  Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009).  The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply when examining that law.  *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

200.  These challenged provisions of SB 202 inflict substantial burdens on Georgia's voters, both through the individual restrictions and provisions and collectively through the combined effect of all of the restrictions and barriers.

201.  The burdens caused by these provisions, individually and collectively, are serious and substantial, and in some cases cause voters to risk being completely disenfranchised.

202.  No legitimate state interest justifies these significant restrictions and burdens.

203. The purported goals of increasing confidence in elections or encouraging uniformity are pretextual at best, and in fact would be harmed by imposing the aforementioned restrictions and requirements of SB 202.

204. These restrictions could undermine, not restore, confidence in Georgia's elections, and would do so at the expense of imposing undue burdens on voters.

205. The requirements and prohibitions in these provision of SB 202, individually and collectively, impose a substantial burden on the fundamental right to vote of Georgia citizens, and are neither justified by, nor necessary to promote, interests put forward by the State that were not already being adequately protected by pre-existing criminal laws and election procedures.

206. These provisions will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT IV

### 42 U.S.C. § 1983
**(Freedom of Expressive Conduct and Speech in Providing Food and Drink First And Fourteenth Amendments)**

207. Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

208.  The First Amendment to the Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech and expression.

209.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States by a person acting under the color of state law.

210.  The provision of SB 202 that criminalizes "line warming activities" will chill protected expressive conduct and speech that supports of the act of voting by exposing to criminal prosecution those who provide sustenance to voters waiting in long lines.

211.  The Plaintiffs who have supported in-person voting in past elections by providing food and/or drinks to voters who request such while waiting in long lines to vote have done so without complaint or incident.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate or political party while providing such food and/or drinks.

212.  The Plaintiffs who provide this sustenance have done so as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.

213.  SB 202 restricts Plaintiffs' and their members' core political speech and expressive conduct in "line warming activities" and the restrictions on these acts of kindness are content based restrictions on speech and expression about a particular subject matter (expressive support for voting) in a public forum.  It is also not supported by either a compelling (or even reasonable) governmental interest and is not narrowly tailored to any legitimate or compelling governmental interests.

214.  The kindness of providing food and drink in a non-partisan way to anyone who requests sustenance while waiting in a long line to vote does not exact political pressure or intimidation on voters.  Moreover, existing state and federal laws already prohibit improper interference, political pressure or intimidation of voters engaged in in-person voting.

215.  As a result of SB 202, the Plaintiff organizations who have engaged in "line warming" activities will not be able to carry out a key aspect of their organizational mission in supporting voters who wait in long lines to vote.

216.  Plaintiffs who seek to continue "line warming" in future elections cycles are chilled by the specter of criminal prosecution under the provisions of SB 202.

217.  Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## COUNT V

### 52 U.S.C. § 10101, 42 U.S.C. § 1983
**(Immaterial Voting Requirement)**

218.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

219.  52 U.S.C. § 10101(a)(2)(B) prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

220.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States by a person acting under the color of state law.

221.  Section 25 of SB 202 provides that "[i]n order to confirm the identity of the voter, such [absentee ballot application] shall require the elector to provide his or her . . . date of birth," among other information, and that registrars or

absentee ballot clerks "shall compare the applicant's . . . date of birth . . . with the information on file in the registrar's office."

222.  Section 27 of SB 202 mandates that absentee ballot envelopes require absentee voters to provide their date of birth, and Section 29 of SB 202 provides that the registrar or clerk "shall then compare the . . . date of birth entered on the absentee ballot envelope with the same information contained in the elector's voter registration records."  Section 29 of SB 202 also provides that the registrar or clerk must reject the absentee ballot envelope "if the identifying information entered on the absentee ballot envelope does not match the same information appearing in the elector's information appearing in the elector's voter registration record, or if the elector has failed to furnish required information."

223.  SB 202 violates Plaintiffs' rights under 52 U.S.C. § 10101(a)(2)(B). It mandates that Georgians provide information—and requires county election officials to reject absentee ballot applications and absentee ballots based on a failure to provide exactly matching information—that is not material to determining whether individuals are qualified to vote and not a unique voter identifier in order to successfully apply for and cast an absentee ballot.

224.  **WHEREFORE**, Plaintiffs pray for relief as set forth herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that the challenged provisions in SB 202 violate the prohibitions on discriminatory purpose under the Fourteenth and Fifteenth Amendments to the United States Constitution, the intent prong of Section 2 of the Voting Rights Act, and 42 U.S.C. § 1983;

2.      Declare that the challenged provisions in SB 202 violate the results prong of Section 2 of the Voting Rights Act, and 42 U.S.C. § 1983;

3.      Declare that the challenged provisions of SB 202 set forth in the Third Claim of the Second Amended Complaint violate the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to vote;

4.      Declare that the challenged provision of SB 202 as set forth in the Fourth Claim of this Second Amended Complaint violates the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to free speech and freedom of association;

5.      Declare that the challenged provisions of SB 202 as set forth in the Fifth Claim of this Second Amended Complaint violate the Civil Rights Act;

6.   Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of SB 202;

7.   Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10301 and other applicable laws; and

8.   Order any other relief that this Court deems just and proper.

Dated:  January 19, 2024

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
Heather Szilagyi*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
hszilagyi@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes*
Neil Oxford*
Gregory Farrell*
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*/s/ Laurence F. Pulgram*
Laurence F. Pulgram*
lpulgram@fenwick.com
Molly Melcher*
mmelcher@fenwick.com
Armen Nercessian*
Anercessian@fenwick.com
Ethan Thomas*
EThomas@fenwick.com
FENWICK & WEST LLP
555 California Street
San Francisco, CA  94104
Telephone:    (415) 875-2300

Joseph S. Belichick*
jbelichick@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone:  (650) 988-8500

Catherine McCord*
cmccord@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY  10010
Telephone: (212) 430-2690

/s/ Gerald Weber_____
Gerald Weber
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
Telephone: 404.522.0507
Email: wgerryweber@gmail.com


*Admitted pro hac vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE AND OF SERVICE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF has been

prepared in Times New Roman 14, a font and type selection approved by the Court

in L.R. 5.1(C), and that I provided notice and a copy of the foregoing using the

CM/ECF system which will automatically send e-mail notification of such filing to

all attorneys of record.

Respectfully submitted this 19th day of January , 2024.

_/s/ Bryan L. Sells_
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC.
P.O. Box 5493
Atlanta, GA 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

_Counsel for Plaintiffs_
